# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| IN RE: | : | CIVIL ACTION |
| LINCOLN NATIONAL COI | | No. 16-06605 |
| LITIGATION | : | |


**PAPPERT, J.**                                           **September 11, 2017**

## <u>MEMORANDUM</u>

This case is a consolidated class action brought on behalf of the named Plaintiffs[1] and all similarly situated owners of JP Legend 300 and JP Lifewriter Legend 100, 200 and 400 life insurance policies. Among other things, Plaintiffs challenge a Cost of Insurance ("COI") rate increase imposed on certain policyholders by Lincoln National Life Insurance Co. ("Lincoln"), a wholly-owned subsidiary of Lincoln National Corporation ("Lincoln National"). The Policies give Lincoln discretion to determine the COI rate based on its expectation of future mortality, interest, expenses and lapses. In September 2016, Lincoln announced a COI rate increase for policies that have been in force for up to eighteen years. Plaintiffs contend Lincoln based the COI increases on

---

[1]       Among the named Plaintiffs are the "US Life Plaintiffs," LLCs that own policies insuring the life of Texas-based Ms. Martindale; the "Kanter Plaintiffs," Maryland residents with a policy insuring Alan Kanter; Ivan Minlind, or the "Mindlin Plaintiff," a California resident and trustee of the Mindlin Irrevocable Trust, which holds a policy insuring California resident Allen Mindlin; the "Weinstein Plaintiffs," Georgia residents and co-owners of a policy insuring Kay Weinstein; the "Rauch Plaintiffs," North Carolina residents who own a policy insuring Lillian Rauch; "Bharwani," a New Jersey resident and policyowner; "Zirinsky," a New York resident and policyholder; "Milgrim," a New Jersey limited partnership that owns a policy; "Mikamal," a Florida resident and trustee of the Mutual Benefits Keep Policy Trust, and owns interests in five policies issued in Florida. *See* (CC ¶¶ 9–17).

impermissible considerations, failed to apply the changes uniformly to policyholders in the same rate class and wrongfully refused to provide some policyholders with illustrations when requested.

On April 19, 2017, Plaintiffs filed a Consolidated Complaint in this Court asserting eleven claims against Defendants on behalf of themselves and others similarly situated.[2]  (ECF No. 30.)  Specifically, the Complaint alleges claims for (1) breach of contract; (2) breach of implied covenant of good faith and fair dealing; (3) injunctive relief as to illustrations; (4) injunctive relief as to the COI increase; and (5) declaratory relief as to the COI increase, as well as violations of (6) the North Carolina Deceptive and Unfair Trade Practices Act, N.C. Gen. Stat. § 75-1, *et seq.*; (7) the Texas Administrative Code and the Texas Insurance Code, 28 Texas Admin Code §§ 21.2206–21.2212 and Tex. Ins. Code. Art. 21.21; (8) the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.*; (9) the New York General Business Law § 349; (10) the California Unfair Competition Law, Cal Bus. & Prof. Code §§ 17200, *et seq.*; and (11) the California Elder Abuse Statute, Cal. Welf. & Inst. Code §§ 15610, *et seq.*

On June 8, 2017, Defendants filed a Motion to Dismiss the Complaint. (ECF No. 40-1.)  Plaintiffs responded on July 28, (ECF No. 44), and Defendants replied on August 17, 2017, (ECF No. 47).  On August 22, 2017, the Court heard oral argument on the Motion (ECF No. 40.) which the Court, for the reasons below, grants in part and denies in part.

**I.**

---

[2]    Some claims are brought only on behalf of certain sub-classes.  For purposes of analyzing the sufficiency of the allegations, however, the Court uses "Plaintiffs" generically to refer to the particular Plaintiffs asserting the claim being discussed.

**A.**

Plaintiffs are all owners of flexible premium universal life insurance policies ("the Policies"[3]) issued between 1999 and 2007 by Jefferson-Pilot Life Insurance Company, a subsidiary of Jefferson-Pilot Corporation, which was acquired by Lincoln National in a cash and stock merger in 2006.  (CC ¶¶ 1, 18, 23.)  Plaintiffs allege that as a result of the merger, the Policies "were absorbed, owned and controlled by the combined company, Lincoln National, which sold and operated its universal life insurance products through its subsidiary Lincoln Life and Lincoln National's marketing arm doing business as Lincoln Financial Group."  (*Id.* ¶ 18.)  The Policies differ from standard whole life insurance policies in that the premium payments are flexible; policyholders can adjust both the amount and frequency of their premium payments so long as they maintain sufficient funds in the account to cover a Monthly Deduction, which consists of a Cost of Insurance ("COI") charge and certain other expenses.  (*Id.* ¶ 25.)  The Policies also offer a savings or investment component; the Policy Account into which policyholders make premium payments earns interest at a rate determined by Lincoln, with a minimum guaranteed rate of four percent (4%).  (*Id.* ¶¶ 24, 28, 54.)  Policyholders are able to adjust the face amount of their coverage as well as allocate their contributions between the "term life insurance" component and the savings or investment component.  (*Id.* ¶¶ 24–29.)

---

[3]     Though Plaintiffs do not all own the same policy, the various policies owned by Plaintiffs all contain the same language at issue and were all subject to significant COI increases in 2016.  (CC ¶ 36.)

Thus, a policyholder makes payments into an individual, interest-bearing "Policy Account." Each month, Lincoln withdraws a Monthly Deduction from the account and deposits a separate amount of interest. If a policyholder chooses to pay premiums in excess of the amount of the Monthly Deduction, the excess funds are then added to the Policy's accumulated Policy Value. If the Monthly Deduction exceeds the interest generated for the month (plus any amounts paid into the Policy Account), however, the Policy Value (and interest generating principal) is reduced by the amount of the Monthly Deduction. (*Id.*) Policyholders must maintain a positive Policy Value in order to avoid a lapse of the Policy. (*Id.* ¶¶ 25–29.)

According to Plaintiffs, the size of the COI charge is important for two reasons: it is "typically the highest expense a policyholder pays" and it "is deducted from the Policy Account (*i.e.*, the savings or investment component), so the policyholder forfeits the COI charge entirely." (*Id.* ¶ 30.) Consequently, the higher the COI charge, the greater the amount of the premiums required to maintain a positive Policy Value and avoid a lapse. (*Id.* ¶¶ 27, 30.)

**B.**

The Policies specify how the Monthly Deduction is calculated:

**Monthly Deduction** The Monthly Deduction for a policy month will be computed as (1) plus (2) where

(1) is the cost of insurance and the cost of additional benefits provided by rider for the policy month.

(2) is the sum of all administrative charges for the policy and any attached riders shown on page 4 as being due for the policy month.

. . .

**Cost of Insurance**      The cost of insurance is determined on a monthly basis as the cost of insurance rate for the month multiplied by the number of thousands of net amount at risk for the month. The net amount at risk for a month is computed as (1) minus (2) where

(1) is the death benefit for the month before reduction for any indebtedness, discounted to the beginning of the month at the guaranteed rate.

(2) is the policy value at the beginning of the month.

. . .

**Cost of Insurance Rates**      The monthly cost of insurance rates are determined by us. **Rates will be based on our expectation of future mortality, interest, expenses, and lapses.** Any change in the monthly cost of insurance rates used will be on a uniform basis for insureds of the same rate class. Rates will never be larger than the maximum rates shown on page 11. The maximum rates are based on the mortality table shown on page 4.

(Policy, at 8, ECF No. 40-3 (emphasis added).[4])

The Policies also provide that "[u]pon request, we will provide, without charge, an illustration showing projected policy values based on guaranteed as well as current mortality and interest factors." (Policy, at 9); (CC ¶ 35.) An illustration depicts a series of future policy values, surrender values and death benefits based on, *inter alia*, assumed future premium payments and currently payable rates for non-guaranteed elements, including COI rate, interest rate and policy expenses. (Policy, at 9); (SJR Decl., at 7–9, ECF No. 40-4.)

**C.**

---

[4] The Policy is attached to Defendants' Motion to Dismiss as Exhibit 1. (ECF No. 40-3.) The Court cites to the page numbers located on the bottom of the Policy itself.

In August 2016, Lincoln announced that it would be increasing the COI rate applicable to certain policies effective October 2016. (CC ¶ 37.) Lincoln purported to explain the reasons behind the increases in a September 2016 notice sent to policyholders. (*Id.* ¶ 38); (Notice, ECF No. 40-5.) In relevant part, the notice states:

> We are operating in a challenging and changing environment as we continue to face nearly a decade of persistently low interest rates, including recent historic lows, and volatile financial markets. Prudent management of our business and monitoring of the external environment have been crucial to Lincoln's 110-year track record of helping people secure their financial futures, and remains so today. This includes making fair and responsible adjustments as necessary and appropriate to ensure we are providing value to our customers while operating responsibly for the long-term.

(Notice, at 2.)

The Notice also contained an "FAQ" section:

### 1. Why are Cost of Insurance (COI) rates changing on my policy and what does that mean?

Cost of Insurance (COI) rates are based on certain cost factors, including mortality, interest, expenses and lapses. Our future expectations for these cost factors have changes therefore policy COI rates have been adjusted to appropriately reflect those future expectations.

(Notice, at 3.)

Lincoln also made statements regarding the COI rate increase in an August 29, 2016 update:[5]

> The life insurance industry is operating in a challenging environment, notably with pressure from historically low interest rates, making it increasingly important for us to take the fair and responsible steps necessary to ensure we both provide value to our

---

[5] It is unclear whether the update was disseminated to policyholders; the bottom of the document states: "For agent/Broker use only. Not for use with the public." (ECF No. 40-6.)

policyholder and partners, and operate responsibly for the long-term.

This includes taking prudent measures in managing interest rate-sensitive products, while enhancing and expanding our broad portfolio of products that are less interest rate sensitive. In response to the persistent low interest rates, including the recent historic lows, there will be pricing increases on the *Lincoln LifeGuarantee UL* product effective 9/12/16.

While actions that impact customers are never a first course of action, this decision is consistent with our philosophy of providing valuable solutions appropriately priced for market conditions.

(Update, at 1.)

The update further explained:

These adjustments are based on material changes in future expectations of key cost factors associated with providing this coverage, including:

- Lower investment as a result of continued low interest rates
- Updated mortality assumptions, including instances of both higher and lower expected mortality rates versus prior expectations
- Updated expenses, including higher reinsurance rates.

(*Id.* at 4.)

Plaintiffs contend that "[t]he COI rate is by far the most costly and important component of the Monthly Deduction charge," and "[s]mall changes in the [COI rate] can produce a dramatic increase," in the charge, particularly at older attained ages. (CC ¶ 27.) Plaintiffs allege that the new rate produced dramatic COI increases ranging from 50 to 95% depending on the policyholder, significantly increasing the Monthly Deductions and, along with them, the premiums necessary to maintain coverage. (CC ¶¶ 5, 27, 30, 41.) Plaintiffs point

out that, due to the increases, many of Plaintiffs' Policies no longer make economic sense.

For instance, the COI charge for the Rauch Plaintiffs "rose by nearly 85% between October and November 2016," "rendering [the Policy] all but worthless in a very short time without a significant additional cash outlay for the remainder of the in-force time period." (*Id.* ¶ 13.)  Bharwani, who would have paid off her Policy by age 65 paying her old premium of $4,700 per year, is now subject to a $5,085 per year premium and will not have paid off her Policy until age 100.  (*Id.* ¶ 14.)  Likewise, following the COI increases, the amount of premiums required to maintain his coverage increased from $186.55 per year to $4,203.00 per year for Zirinsky, and from $4,669.00 per year to $17,077.42 for Milgrim.  (*Id.* ¶¶15–16.)  Mukamal's COI rate increased by 68%, which doubled the amount of his Monthly Deduction from $15,922 to $31,085.  (*Id.* ¶ 17.)

### D.

Plaintiffs allege that Lincoln is not permitted to set or increase COIs to recoup past losses based on changes in interest rates or miscalculations in past mortality assumptions.  (*Id.* ¶¶ 31–34.)  Likewise, Lincoln may not use its discretion to set the COI rate to manage profitability, offset diminished returns in Lincoln's overall portfolio or offset its obligation to pay credited interest at the minimum guaranteed rates.  (*Id.*)  Plaintiffs contend Lincoln nevertheless based the COI increases on such impermissible factors such as lower investment income, higher reinsurance rates, historic low interest rates, past losses and poor portfolio management.  *See* (*id.* ¶¶ 6, 38–39, 41, 52, 54–60).

Plaintiffs allege that because low interest rates have undermined the profitability of Plaintiffs' Policies (which guarantee higher interest rate accruals on account balances), Lincoln is impermissibly using its discretion to recoup past losses or "blunt the impact of the prevailing low interest rate environment." *See* (CC ¶¶ 51–56). They further allege that Lincoln intentionally increased the COI rate by such a large magnitude in order to induce "shock lapses" and avoid paying out death benefits to Plaintiffs. (*Id.* ¶¶ 56, 60, 120.) Plaintiffs further contend that those hit the hardest by the increases are elder policyholders, many of whom have dutifully paid premiums for over a decade expecting protection for themselves and their families in their twilight years. *See* (CC ¶¶ 56–57, 59–60).

According to Plaintiffs, when Jefferson-Pilot priced and sold the Policies, it established a Monthly Deduction schedule designed to generate high profits in early durations followed by potential losses in later durations. (*Id.* ¶¶ 55, 57.) Plaintiffs view Lincoln's COI rate increase as an attempt to "reverse that decision" and "impose unfair and excessive COI rate increases to recoup the reduced profits and losses resulting from the rate schedule the company it acquired affirmatively enacted," specifically targeting those Policies that, by design, are in the least profitable stage for Lincoln. (*Id.* ¶¶ 55, 57); *see also* (Tr. 101:21–102:11). Plaintiffs contend this effort to effectively shrink the size of an "old, unprofitable block" of Policies is particularly injurious to this class of elderly policyholders not only because they have contributed thousands of dollars in premiums over longer periods of time, but also because, due to age-related

underwriting considerations, life insurance protection is now either unavailable or prohibitively expensive for them to obtain.  (*Id.* ¶ 59.)

## II.

To survive a motion to dismiss under Rule 12(b)(6), a complaint must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.* (citation omitted).  While a complaint need not include detailed facts, it must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

*Twombly* and *Iqbal* require the Court to take three steps to determine whether the complaint will survive defendants' motion to dismiss.  *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016).  First, it must "take note of the elements the plaintiff must plead to state a claim."  *Id.* (quoting *Iqbal*, 556 U.S. at 675).  Next, it must identify the allegations that are no more than legal conclusions and thus "not entitled to the assumption of truth."  *Id.* (quoting *Iqbal*, 556 U.S. at 679).  Finally, where the complaint includes well-pleaded factual allegations, the Court "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Id.* (quoting *Iqbal*, 556 U.S. at 679).

This "presumption of truth attaches only to those allegations for which there is sufficient factual matter to render them plausible on their face." *Schuchardt v. President of the United States*, 839 F.3d 336, 347 (3d Cir. 2016) (internal quotation and citation omitted). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id.* This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (quoting *Connelly*, 809 F.3d at 786–87).

### III.

As an initial matter, Defendants contend the five contract-based claims must be dismissed against Lincoln National because Plaintiffs have not adequately alleged that Lincoln National is in contractual privity with Plaintiffs. *See* (Defs.' Mot., at 20–21). "[P]rivity of contract is a longstanding pillar in Pennsylvania contract law." *Al's Auto Inc. v. Hollander, Inc.*, No. 08-CV-731, 2008 WL 4831691, at *4 (E.D. Pa. Nov. 4, 2008). In their Complaint, Plaintiffs allege that "Lincoln National is the successor-in-interest to Jefferson-Pilot." (CC ¶ 1.) Plaintiffs support that allegation with the fact that Jefferson-Pilot issued the life insurance policies, and Lincoln National acquired Jefferson-Pilot in a $7.5 billion cash and stock merger in 2006. (CC ¶¶ 1, 18.)

Under Pennsylvania law, "[i]t is generally true that a company which buys the assets of another company is not liable for the debt or liabilities of the purchased company;" however, there is an exception to the general rule where "the transaction amounts to a consolidation or merger." *Al's Auto Inc.*, 2008 WL

4831691, at *4.  In the case of a merger, the purchasing company becomes a successor-in-interest and is in privity with those who contracted with their predecessor.  *Id.*  Whether a transaction is considered a merger depends on four factors, key among them whether there has been a transfer of stock, which heavily favors finding a merger.  *Id.* at *5.  Defendants nevertheless argue that Plaintiffs' "successor-in-interest" assertion is conclusory and that the 2006 merger and acquisition is "not probative" because "a stock acquisition, for example, would not have made any change in the parties to the acquiror's or the target's policies."  (Defs.' Mot., at 21.)

At this stage in the proceedings, Plaintiffs have adequately supported their allegation that Lincoln National is successor-in-interest to Jefferson-Pilot, in privity of contract with Plaintiffs and "in that capacity and in conjunction with Lincoln Life, the Lincoln Defendants have subjected the plaintiff owners to unlawful [cost of insurance] increases."  (CC ¶¶ 1, 18.)  The standard is not whether supporting facts are "dispositive," but whether they make Plaintiffs' allegation plausible.  Here, given the billion dollar stock merger, and in the absence of any counterarguments or forthcoming details from Defendants, Lincoln National will continue as a party in this matter and Plaintiffs may proceed with their contract-based claims against both Defendants.  *See Al's Auto Inc.*, 2008 WL4831691, at *5 (allegation that transfer of stock occurred sufficient to keep potential successor-in-interest as a party past the pleading stage).

**IV.**

In order to state a claim for breach of contract, a plaintiff must allege the existence of a contract, including its essential terms, a breach of a duty imposed by the contract and resultant damages.[6] *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (citation omitted). Plaintiffs contend that Defendants breached the contract by basing the COI increase on impermissible factors, failing to apply the increases in a uniform manner across rate classes and refusing to provide some policyholders with illustrations when requested. *See* (CC ¶¶ 40–41, 51–52, 61–62, 64–66). The Court addresses each theory in turn.

## A.

Plaintiffs first contend the Policies expressly limit the grounds upon which Lincoln can raise COI rates to Lincoln's "expectation of future mortality, interest, expenses, and lapses," and Lincoln breached by imposing the COI increase to recoup past losses and for other impermissible reasons. *See, e.g.*, *Fleisher v. Phoenix Life Ins. Co.*, 18 F. Supp. 3d 456, 470 (S.D.N.Y. 2014) ("when a universal life insurance policy states that the policyholder's COI rate is 'based on' certain pricing factors, that list of factors is exhaustive, not illustrative") (collecting cases); *Yue v. Conseco Life Ins. Co.*, No. 08-1506, 2011 WL 210943, at *7 (C.D. Cal. Jan. 19, 2011) (where policy specified that the COI rate would be determined based on insurer's expectation as to future mortality experience, insurer breached by considering non-enumerated factors).

---

[6] Though Pennsylvania's choice of law rules may ultimately require the Court to analyze various Plaintiffs' breach of contract claims under the law of different states, both parties have agreed that for the purpose of this Motion, no conflicts in state law exist and the Court may apply the contract law of any of the relevant states. (Tr. 8:11–9:17.) Among others, the parties cite Pennsylvania, California and North Carolina law in their briefs.

Defendants appear to acknowledge that, if Lincoln did raise the COI based on non-enumerated factors, it would constitute a breach of contract. (Defs.' Mot., at 3–4); (Tr. 17:14–18.) However, they deny doing so. They argue that the considerations outlined in their statements all fall within the four permissible factors and Plaintiffs have not otherwise alleged facts "showing that Lincoln Life relied on anything other than the contractually permitted factors in implementing the COI Adjustment." (Defs.' Mot., at 4.) In support of their contention that Lincoln considered impermissible factors, Plaintiffs point to Lincoln's notice and update, a statement allegedly made by Lincoln's CEO and publicly available information relevant to some of the permissible factors.

### i.

First, Plaintiffs point to Lincoln's August 2016 update and September 2016 notice and argue that Lincoln's statements therein demonstrate that the COI rate increase was based on impermissible, backward-looking considerations. Defendants disagree and contend that the grounds provided in the notice "precisely mirror" the four permissible COI factors. (Defs.' Mot., at 4.) In particular, they point to the FAQ portion of the notice which parrots the permissible factors and attributes the increase to them. (*Id.*) They likewise point to the portion of the update that attributes the adjustments to "material changes in **future expectations** of key cost factors associated with providing this coverage." (Update, at 4.)

The notice, however, also refers to "nearly a decade of persistently low interest rates, including recent historic lows, and volatile financial markets."

(Notice, at 2.)  And the update states: "**In response to** the persistent low interest rates, **including the recent historic lows**, there will be pricing increases on the *Lincoln Life Guarantee UL* Product effective 9/12/16." (Update, at 1 (emphasis added)).  Thus, while some of Lincoln's statements mirror the Policy language, attribute the increases to changes in future expectations and suggest Lincoln was looking prospectively, other statements could be construed as suggesting that the decision was backward-looking and based, at least in part, on *past* "persistent low interest rates, including the recent historic lows" and their *past* effects on the company's "interest rate-sensitive products."  (*Id.* at 1.)

Plaintiffs further allege that "Lincoln's President and CEO Dennis Glass admitted to a reporter on or around September 16—during [the] same time [the] increase was announced—that Lincoln sees in-force repricing (*i.e.*, the COI increase) as an opportunity to blunt the impact of the prevailing low interest rate environment."  (CC ¶ 52); *see also* (Pls.' Resp. in Opp., at 3 n.2).

Lincoln argues that its statements regarding the prevailing low interest rate environment, in the notice or otherwise, do not suggest anything improper since certainly "the recent interest rate environment may well change a company's future expectations of what interest would be."  (Tr. 15:24–16:1); *see also* (Defs.' Mot., at 5.)  This may well be true and, if past interest rates were only considered in an effort to formulate future expectations with respect to one of the enumerated factors, permissible.  However, construing documents and drawing inferences in the light most favorable to Plaintiffs, as the Court must at this stage, the documents are far from "unambiguous" and some of Lincoln's

statements can fairly be read as suggesting Lincoln based the COI rate increase

on impermissible factors, such as past low interest rates and resulting losses.

Combined with Plaintiffs' allegations that prevailing low interest rates have

rendered these Policies particularly burdensome to Lincoln due to their high

guaranteed interest rate, (CC ¶¶ 54–57), and the especially large magnitude of

the COI rate increase, Lincoln's statements "nudge [Plaintiffs'] claims across the

line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Plaintiffs'

allegations are sufficient to state a claim for breach of contract. *See DCD

Partners, LLC. v. Transamerica Life Ins. Co.*, No. 2:15-cv-03238-CAS, 2015 WL

5050513, at *6 (C.D. Cal. Aug. 24, 2015) (allegation that insurer increased COI

rate by massive amount was sufficient to make it plausible that insurer breached

by considering impermissible factors); *Feller v. Transamerica Life Ins. Co.*, No.

2:16-cv-01378-CAS, 2016 WL 6602561, at *10 (C.D. Cal. Nov. 8, 2016) (allegation

that insurer raised COI rate to recoup past losses plausible where insurer

suffered significant losses on subject policies due to their high guaranteed

interest rate); *Palumbo v. Nationwide Life Ins. Co.*, 3:16-cv-01143-WWE, 2017

WL 80405, at *3 (D. Conn. Jan. 9, 2017) (allegation that defendant insurer failed

to follow required formula in calculating the COI rate sufficient to state breach

of contract claim).

### ii.

Next, Plaintiffs argue that even taking Lincoln's explanation as true,

several of the factors on which it purported to base the COI rate increase, such

as "lower investment income as a result of continued low interest rates" and

"updated expenses, including higher reinsurance rates," do not fit within the permissible considerations.  (CC ¶¶ 44–45); *see also* (Resp. in Opp., at 11–14).

Plaintiffs contend that "[l]ower investment income as a result of continued low interest rates" is not a permissible consideration for two reasons.  First, neither Lincoln's investment income nor its investment earnings is an enumerated factor, and Plaintiffs allege Lincoln's consideration of such investment income is a "naked attempt to circumvent the guaranteed minimum interest rate that the policies promise to credit to policyholders."  (CC ¶ 44.) Plaintiffs' argument, based on a potential distinction between "interest" and "investment income as a result of interest rates," is not implausible, *see, e.g.*, *Fleisher*, 18 F. Supp. 3d at 470 (policy specifically enumerated "investment earnings" as a permissible factor); *see also U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 130 (S.D.N.Y. 2015) ("Nothing . . . permits Phoenix to . . . use COI rate increases to manage Phoenix's profitability."), and the Court cannot at this stage decide that the Policy unambiguously permits Lincoln to consider its investment income.  Plaintiffs further claim that even if the "interest" factor does permit Lincoln to base an increase on its *future* expectations of investment income, Lincoln nevertheless breached by basing the increase on its past or current low investment income.  (CC ¶ 44.)

Plaintiffs also allege that "higher reinsurance rates" are not the type of future "expenses" Lincoln is permitted to consider.  (CC ¶ 45.)  In their Motion, Defendants reject this argument, claiming that "reinsurance is an expense Lincoln incurred" and Plaintiffs failed to allege any basis for distinguishing

between various types of expenses. (Defs.' Mem., at 8.) Plaintiffs, however, alleged that the reinsurance costs cannot be included in the permissible category of expenses because they are "not a cost of directly administering the policy." (CC ¶ 45.) At this stage, it is not implausible that the provision permitting Lincoln to consider future "expenses" as part of the Charge of Insurance calculus would be limited to certain expenses—such as those related to administering the Policies—rather than all expenses incurred by the insurer.

Plaintiffs have adequately alleged that Lincoln's admitted consideration of lower investment income and higher reinsurance costs constituted breaches of the Policies terms.

### iii.

In addition to their allegations regarding Lincoln's own statements, and their arguments for why at least two of Lincoln's admitted considerations were impermissible, Plaintiffs also alleged various facts, statistics and publicly-available information regarding Lincoln's income, expectation of mortality and nationwide mortality trends generally. Because Plaintiffs' allegations regarding the nature of the policies, the significant magnitude of the COI increases and Lincoln's own stated reasons for the changes are sufficient to make Plaintiffs' claims plausible, the Court only briefly addresses Plaintiffs' additional allegations and Defendants' extensive objections thereto.[7]

---

[7] The thrust of Plaintiffs' argument is that particularly given trends of improving mortality, Lincoln's expectations with respect to mortality, expenses and investment income (to the extent they are permissible considerations) could not have changed materially or to the large degree necessary to justify a COI rate increase of this scale. (CC ¶¶ 40–50.)

Plaintiffs first alleged facts potentially relevant to Defendants' investment income, including return rates, fees from COI charges and investment income growth. (CC ¶ 43.) However, Defendants' objections—that (1) Plaintiffs' economic analysis was too temporally limited, (2) fees derived from COI charges include fees derived from products other than the Policies and, in any event, are not a proxy for investment income and (3) investment income growth is meaningless without reference to the size of the portfolio generating it—are well-taken. (Defs.' Mem., at 6–8.)

More significantly, however, Plaintiffs alleged that mortality—"the most important element" and the driving factor in setting the COI rate—has improved nationwide since the Policies were issued and is expected to continue improving. (CC ¶ 48.) Moreover, Plaintiffs contend that Lincoln filed interrogatories with

---

At oral argument, Defendants repeatedly tried to characterize "the theory of Plaintiffs' Complaint" as relying solely on these facts and the attendant deductive chain of logical reasoning to conclude that "because changes in those factors could not have supported a COI increase of this size, Lincoln *must have* considered other, impermissible factors." *See* (Tr. 19:11–20:16, 21:21–23:8, 26:11–20, 38:23–39:21, 41:4–22, 42:1--43:1, 143:2–16 ).

Plaintiffs' Complaint and briefing, however, bely this characterization. Rather, Plaintiffs' allegation that Lincoln based the increases on impermissible reasons is grounded and "based in large part on Lincoln's own stated reasons and admissions." (Pls.' Resp. in Opp., at 7.) In Plaintiffs' view, Lincoln's statements constitute direct evidence that it relied on impermissible considerations. To be sure, Plaintiffs also allege facts and publicly-available information regarding changes and trends in the relevant factors in an effort to show that any such changes would be unlikely to support COI increases of this magnitude. However, rather than the sole basis of their claim or a required link in their logic, this was merely additional circumstantial evidence supporting its allegation—grounded primarily in Lincoln's own statements—that Lincoln considered non-enumerated factors.

Defendants, presumably due to their opinion that Lincoln's statements were unambiguous and "plainly show[ ] the COI Adjustment was based on permitted changes in future expectations," (Tr. 16:7–18:25; Defs.' Mot., at 5), attempt to assign them no evidentiary value and characterize Plaintiffs' claim as supported solely by the information relevant to the four factors. Defendants therefore spill much ink explaining why those particular statistics or allegations do not accurately reflect Lincoln's actual expectations with respect to mortality or income, ultimately concluding that, due to defects in the proffered information and Plaintiffs' faulty conclusions drawn therefrom, Plaintiffs' claim must be implausible. (Defs.' Mot., at 6–11.)

the National Association of Insurance Commissioners in each year from 2010 to 2014 stating its expectation that mortality will improve in the future. (*Id.* ¶¶ 47–48.) Finally, Plaintiffs claim that the COI rate change, when applied to certain policies, resulted in "a large and unusually sloped increase" that requires policyholders to pay higher COI rates when younger than when older. (*Id.* ¶ 50.) Plaintiffs argue that this further calls into question whether some other factor was considered because mortality typically causes the COI to increase with duration. (*Id.*)

Defendants respond that general nationwide mortality improvement does not mean that mortality has improved for insureds of all ages and rate classes and, in any event, is not necessarily consistent with Lincoln's own mortality assumptions or experience. (Defs.' Mem., at 9.) But Defendants' biggest objection is that Plaintiffs have not alleged any facts about the future mortality expectations that prevailed at the time the Policies were created and the COI rates initially set nearly two decades ago. They argue Plaintiffs' allegation that mortality has improved and is expected to continue improving does not "mean that such improvement as have been achieved have matched the improvements that were expected nearly two decades ago." (*Id.*) And if previously-used mortality assumptions were *overly optimistic*, even improving mortality could support a COI increase. (*Id.*)

Defendants objections with respect to the mortality factor do not render Plaintiffs' allegation "meaningless"; the fact that Lincoln expects mortality to continue improving—even if at a reduced degree than previously expected—

nevertheless makes it less likely that expectations with respect to this factor have changed so significantly so as to support an increase of the huge magnitude alleged. In any event, Plaintiffs have stated a claim.

## B.

Plaintiffs also contend Defendants breached the policies terms by failing to apply the COI rate increase uniformly across policyholders in the same rate class. They allege that an illustration provided by Lincoln of the COI increase on the Martindale Policies shows increases of roughly 95% in the first year and 50% in the remaining two years and results in the COI rates being higher when the insured is 98 years old than when she is 99 years old. (CC ¶¶ 61–62.) Plaintiffs contend "[t]his is illogical and contrary to how the policy was originally priced, and was not replicated across the class. Other named plaintiffs, and other victimized policyholders of the same rating class, did not receive an increase with this strange and illogical slope." (*Id.* ¶ 62.) These allegations are sufficient to state a claim.

## C.

Finally, Plaintiffs claim that Defendants breached the contract by refusing to provide policyholders with illustrations during the Policy's grace period. (CC ¶¶ 64–66.) When the US Life Plaintiffs requested an illustration for the Martindale Policy in January 2017, Lincoln allegedly refused, stating a company-wide policy that "[w]hile a policy is in a grace period, we are unable to provide an inforce illustration." (*Id.* ¶ 65.) Plaintiffs contend that under the

language of the Policy, the Policy remains in force during the grace period, and Lincoln is required to provide an illustration if requested during this time.

Two Policy provisions are relevant here: First, the Continuation of Insurance provision states "[t]his certificate and all riders **will continue in force** according to the terms **as long as** the cash surrender value is sufficient to cover the monthly deduction. If such value is not sufficient, the certificate will terminate according to the grace period provision." (Policy, at 8 (emphasis added).)

Second, the Grace Period provision states:

**Grace Period**     If on a monthly anniversary day the cash surrender value is less than the monthly deduction due, a grace period of 60 days from that date will be allowed for the payment of the minimum amount **needed to continue** the policy. If the no lapse guarantee provision is in effect and the no lapse test has been met, the grace period will not begin and the policy will not be **subject to termination** under this provision.

We will notify you and any assignee of the minimum amount due at least 30 days before the end of the grace period. If the amount specified is not paid within the grace period, **the policy will terminate without value at the end of such period**. If the Insured dies within the grace period, the amount needed to continue the policy to the end of the policy month of death will be deducted from the amount otherwise payable.

(Policy, at 7 (emphasis added).)

Relying on the "will terminate at the end of such period" language, Plaintiffs contend that the Policy is still in force during the grace period because it has not yet terminated. (Pls.' Resp. in Opp., at 19–20.) Defendants, however, relying on the "Continuation of Insurance" provision, argue that the Policy only remains in force "as long as the cash surrender is sufficient" and, though it does

not terminate until the end of the grace period, it is not in force during that time. (Defs.' Mem., at 17–18.)  In theory, the "needed to continue the policy" language could support either interpretation.  (Tr. 49:6–51:1.)  Moreover, both parties contend that Couch on Insurance supports their reading of the provisions.  (Tr. 51:2–52:11, 114:22–115:25.)  The Court cannot say that the Policy language is unambiguous or plainly inconsistent with Plaintiffs' reading at this stage, and Plaintiffs have stated a claim.

## V.

In Count two, Plaintiffs assert a claim for breach of the implied covenant of good faith and fair dealing and contend the implied covenant requires Lincoln to act in a manner that does not frustrate policyholders' reasonable expectations under the Policies, and—to the extent it has limited discretion to set the COI rates—to exercise that discretion reasonably and in good faith.  *See, e.g.*, *Palumbo*, 2017 WL 80405, at *3; *Feller*, 2016 WL 6602561, at *11–13; *U.S. Bank Nat. Ass'n*, 112 F. Supp. 3d at 128; *DCD Partners*, 2015 WL 5050513, at *7–8.

Defendants contend that Plaintiffs' claim is defective because it is based on the same facts as the breach of contract claim and therefore duplicative and cannot be brought as a separate cause of action.  (Defs.' Mot., at 11–14.) Defendants also argue that state law does not recognize implied covenants that are based on breaches of express contract terms.  (*Id.* at 14–16.)

For one, Plaintiffs' claims are not based on the same underlying facts.  *See Feller*, 2016 WL 6602561, at *12 ("Plaintiffs allege more than a mere breach of contract. Plaintiffs allege that defendant used its discretion over MDRs in bad

faith to wrongfully induce forfeiture of death benefits among elderly policyholders. Although the two claims share many of the same predicate allegations, plaintiffs' allege that [Defendant] used its, allegedly limited, discretion over the MDR in bad faith rather than merely in violation of the contract's express terms. Accordingly, plaintiffs' claim for breach of the implied covenant of good faith and fair dealing is not duplicative.").

Moreover, while Defendants are correct that state law does not recognize implied covenants based on breaches of express contract terms, state law does recognize an implied covenant of good faith where, as here, the defendant is expressly given a constrained amount of discretion under the Policy. *See U.S. Bank Nat. Ass'n*, 112 F. Supp. 3d at 129–30 ("Nothing suggests that Phoenix need not set COI rates in good faith."); *see also McNeary-Calloway v. JP Morgan Chase Bank, N.A.*, 863 F. Supp. 2d 928, 956 (N.D. Cal. 2012) ("[W]here a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing."); *Montanez v. HSBC Mortgage Corp. (USA)*, 876 F. Supp. 2d 504, 513 (E.D. Pa. 2012) ("The covenant of good faith may also be breached when a party exercises discretion authorized in a contract in an unreasonable way." (citation omitted)).

Plaintiffs have therefore adequately alleged that Defendants breached the implied covenant by exercising their limited discretion under the Policies in an unreasonable and unfair manner with the bad faith intent of inducing lapses, frustrating policyholders' expectations and depriving them of the benefit of the

agreement.  *See, e.g.*, *Palumbo*, 2017 WL 80405, at *3 (upholding claim on same

or similar theories); *Feller*, 2016 WL 6602561, at *11–12 (same); *DCD*, 2015 WL

5050513, at *7–8 (same); *U.S. Bank Nat. Ass'n*, 112 F. Supp. 3d at 129–30

(same).

## VI.

In Count three, Plaintiffs seek injunctive relief prohibiting Defendants

from refusing to provide illustrations during the grace period and requiring

Defendants to provide certain Plaintiffs with illustrations.  Plaintiffs base this

claim on the same allegations and contract interpretation arguments discussed

*supra* in Subpart IV.C, which the Court determined were sufficiently plausible to

survive the Motion to Dismiss.  Defendants argue the claim seeking injunctive

relief is defective for the additional reason that it does not allege a threat of

irreparable injury.  (Defs.' Mem., at 18.)

While a party seeking preliminary injunctive relief must show that

"irreparable injury will result if this relief is not granted prior to the final

adjudication of the claims on their merits" and "a reasonable probability of

success on the merits and that the possible harm to the opposing party is

minimal," *see Panayotides v. Rabenold*, 35 F. Supp. 2d 411, 417 (E.D. Pa. 1999),

*aff'd*, 210 F.3d 358 (3d Cir. 2000), Plaintiffs do not appear to seek preliminary

injunctive relief prior to the final adjudication of their claims.  Rather, they

request only that injunctive relief be included among the various remedies

available to them should the Court find, pursuant to their breach of contract

claim, that Lincoln is obligated to contractually provide the requested

illustrations. *See* (Pls.' Resp. in Opp., at 20–21). At this stage, such a remedy appears to be appropriate in these circumstances and does not require Plaintiffs to plead irreparable harm. *See* Restatement (Second) of Contracts § 357 (1981) (an injunction may be appropriate if performance due under the contract consists of doing an act and the injunction would require less supervision with respect to compliance than order specific performance).

## VII.

In Count four, Plaintiffs seek injunctive relief prohibiting Defendants from continuing to collect the allegedly unlawful COI charges and ordering Defendants to reinstate any Policies that were forfeited or terminated due to the COI increase. (CC ¶¶ 98–102.) Defendants do not move for the dismissal of this claim.

## VIII.

In Count five, Plaintiffs request declaratory relief resolving the parties' obligations under the Policies, the factors on which Lincoln may base a COI rate increase, the lawfulness of the COI increases and whether the policyholders must continue to pay the allegedly unlawful COI charges. (CC ¶¶ 104–106.) Defendants contend that Plaintiffs' claim for declaratory relief should be dismissed because it is duplicative of the breach of contract claim, would not be practical or useful and is not ripe for review. (Defs.' Mem., at 18–20.)

Under the Declaratory Judgment Act, the Court "may," but is not required to, "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28

U.S.C. § 2201(a). Courts consider four factors when determining whether to grant declaratory relief: "(1) the likelihood that the declaration will resolve the uncertainty of obligation which gave rise to the controversy; (2) the convenience of the parties; (3) the public interest in a settlement of the uncertainty of obligation; and (4) the availability and relative convenience of other remedies." *Terra Nova Ins. Co. v. 900 Bar., Inc.*, 887 F.2d 1213, 1224 (3d Cir. 1989). Moreover, courts routinely decline to consider claims for declaratory relief that are duplicative of other claims already alleged, including breach of contract claims. *See Fleisher*, 858 F. Supp. 2d at 301–03 (dismissing plaintiffs' request for a declaratory judgment in a case involving COI increases because "adjudication of the breach of contract claim [would] address the issues of the validity of the COI Increases on which the claim for declaratory relief rests"); *Danny's Tustin at the Mkt. Place LLC v. Greenwich Ins. Co.*, 2013 WL 12128814, at *7–8 (C.D. Cal. June 6, 2013) ("Plaintiffs' claim for declaratory relief is essentially the same as their breach of contract claim" because "a declaration of [d]efendant's obligations under the Policy is duplicative of the issues that will already be determined through [p]laintiffs' breach of contract claim.").

In response to Defendants' contention that the declaratory relief sought requires adjudication of precisely the same issues as Plaintiffs' breach of contract claim, Plaintiffs state: "The claim for declaratory relief is distinct from the breach of contract claim in that it seeks a declaration on the proper interpretation of the Policies regarding the factors Lincoln may consider when increasing COI rates. This issue is independent of the success of Plaintiffs'

breach of contract claim, and very much ripe given Lincoln's ongoing withdrawals from the Plaintiffs' accumulation accounts." (Pls.' Resp. in Opp., at 22.) The Court nevertheless fails to see how the issue of "the factors Lincoln may consider when increasing COI rates" is "independent of the success of Plaintiffs' breach of contract claim," as adjudication of the latter will necessarily require resolution of the former. The Court therefore declines to exercise its discretionary jurisdiction and grants Defendants' Motion with respect to this claim.

## IX.

Plaintiffs also contend that Defendants violated the consumer protection laws of various states. Though the applicable standard varies slightly by state, the supporting allegations proffered by Plaintiffs are generally the same with respect to each. Defendants argue that Plaintiffs have not alleged sufficient facts to state consumer protection claims and that the claims are duplicative of Plaintiffs' breach of contract claims.

## A.

In Count six, Plaintiffs contend Defendants violated the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen Stat. § 75-1, *et seq.* ("UDTPA"). The statute makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1. "The purpose of G.S. § 75-1.1 is to provide a civil means to maintain ethical standards of dealings between persons engaged in business and the consuming public . . . and applies to dealings between buyers

and sellers at all levels of commerce." *Shepard v. Bonita Vista Properties, L.P.*, 664 S.E.2d 388, 395 (N.C. Ct. App. 2008) (citations omitted).

To state a claim for unfair and deceptive trade practices, a plaintiff must show that: (1) the defendant committed an unfair or deceptive act or practice; (2) the act in question was in or affecting commerce; and (3) the act proximately caused injury to the plaintiff. *SmithKline Beecham Corp. v. Abbott Laboratories*, No. 1:15-CV-360, 2017 WL 1051123, at *11 (M.D. N.C. March 20, 2017) (citing *Dalton v. Camp*, 548 S.E.2d 704, 711 (N.C. 2001)). "An act or practice is unfair if it 'offends established public policy'; if it is 'immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers'; or if it 'amounts to an inequitable assertion of [a party's] power or position.'" *Id.* at *12 (citations omitted).

Defendants first argue that Plaintiffs claim must fail because the underlying allegations are "entirely duplicative of the allegations forming Plaintiffs' breach of contract claim." (Defs.' Mem., at 22.) "[I]t is well recognized that actions for unfair or deceptive trade practices are distinct from actions for breach of contract, and that a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action" under the UDTPA. *Birtha v. Stonemor, N.C., LLC*, 727 S.E.2d 1, 10 (N.C. Ct. App. 2012) (quoting *Eastover Ridge, L.L.C. v. Metric Constructors, Inc.*, 533 S.E.2d 827, 832-33 (N.C. Ct. App. 2000)). Where the misconduct involves a contract, a plaintiff asserting a UDPTA claim must prove the contract breach was surrounded by "substantial aggravating circumstances" in order to state a claim. *Id.* at *13.

> To satisfy a showing of substantial aggravating circumstances, courts have opined that unfairness or 'deception either in the formation of the contract or in the circumstances of its breach' may be adequate. Courts have also found that aggravating factors can 'include an intentional misrepresentation for the purpose of deceiving another and which has a natural tendency to injure the other.' Obtaining a contract without intending to adhere to the contract or abandoning and frustrating its performance can give rise to an action for unfair and deceptive trade practices as well.

*Id.* (internal citations omitted).

Here, Plaintiffs contend that Defendants' conduct rises to the requisite level because it "amount[ed] to an inequitable assertion of [their] power or position" and was "substantially injurious to consumers." (Pls.' Resp. in Opp., at 26–28.) Plaintiffs' allegations are sufficient to meet their burden at this stage. They allege more than just a breach, or even an intentional breach of the Policy on the part of Defendants.

Plaintiffs contend that Defendants acted with the intent of abusing their discretion in order to force policy lapses by policyholders and frustrate the reasonable expectations of policyholders. (CC ¶¶ 56, 120.) Plaintiffs claim the breach was especially egregious because Defendants did not just raise the COI rate for impermissible reasons; they raised it by an enormous amount with the knowledge or intent that doing so would cause devastating injuries to policyholders, which Plaintiffs allege has occurred as intended. (CC ¶¶ 111, 137.) Plaintiffs also assert Defendants' attempt to conceal the breach and represent the COI rate increase was justified under the Policy further aggravated the breach.

Taking these allegations as true, Plaintiffs have adequately alleged the requisite aggravating circumstances. *See SmithKline Beecham Corp. v. Abbott Labs.*, No. 1:15CV360, 2017 WL 1051123, at \*13 (M.D.N.C. Mar. 20, 2017) (knowingly abandoning or frustrating the performance of a contract can give rise to a UDTPA claim); *see also S. Atl. Ltd. P'ship of Tennessee, L.P. v. Riese*, 284 F.3d 518, 536 (4th Cir. 2002) (allegation that party to a contract "manipulated and exploited" the timing of its conduct to ensure that the other party did not receive benefit of the bargain is "the kind of inequitable assertions of power that North Carolina deems to be unfair trade practices").

Defendants also argue that Plaintiffs' UDTPA claim must fail because Plaintiffs did not allege "actual reliance" on an alleged misrepresentation and thus cannot show causation. (Defs.' Mot., at 25–26.) North Carolina law, however, "only requires allegations of reliance where a claim arises from an alleged misrepresentation." *In re: Checking Account Overdraft Litig.*, No. 1:10-CV-22190-2036, 2016 WL 5848729, at \*4 (S.D. Fla., Feb. 5, 2016). Here, though Plaintiffs allege that Defendants engaged in deceptive conduct when they failed to disclose the true reasons behind the COI increase, "the UDTPA claim stands apart from the contention that Plaintiffs' injuries arise out of or stem from any misrepresentation." (Pls.' Resp. in Opp., at 28.) The court in *In re: Charles Ernest Hester*, No. 11-04375-8-DMW, 2015 WL 6125308, at \*4 (E.D. N.C. Bankr., Oct. 16, 2015), addressed this very issue:

> [W]hile misrepresentations by the Defendant are certainly alleged in the 75-1.1 Claim, the claim itself does not "stem from" alleged misrepresentations. In other words, the alleged injuries suffered by the Plaintiffs are not the result of inducement through

> misrepresentations by the Defendant for Plaintiffs to take some
> sort of action. Rather, the alleged misrepresentations comprise the
> broader claim that the Defendant engaged in systemic behavior
> that might qualify as unfair and deceptive under §75-1.1.

*Id.* at *4.

As in *Hester*, Plaintiffs do not allege they were injured as a result of

relying on Lincoln's misrepresentation; rather, they contend that the alleged

misrepresentation was just one part of Defendants' alleged overall scheme to

recoup losses or force policy lapses by effectuating a pretextual COI rate

increase, which not only constituted a breach of contract but also the kind of

"systemic behavior" that may qualify as unfair and deceptive under the UDTPA.

In Defendants' Reply, they contend that *Hester* is inapposite because "[h]ere, the

alleged misrepresentation ***is the claim***." (Defs.' Reply, at 14.) The Court

disagrees; Plaintiffs' Response articulates their theory: they do not contend that

Plaintiffs were injured as the result of being induced into a course of action by a

misrepresentation made by Defendants. Plaintiffs' injuries resulted from the

overall course of conduct, which they contend was inherently deceptive and

unfair. Plaintiffs therefore need not allege reliance, and have stated an

actionable UDTPA claim. *See Hester*, 2015 WL 6125308, at *4 (plaintiff need not

demonstrate reliance to assert a claim that defendant's conduct qualified as

unfair and deceptive acts under Section 75-1.1).

## B.

In Count seven, Plaintiffs assert a claim for violation of Tex. Admin. Code

§§ 21.2206 to 21.2212 and Tex. Ins. Code § 541.061 (formerly Article 21.21). The

statute prohibits an insurer from "us[ing] an illustration that at any policy

duration depicts policy performance more favorable to the policy owner than that produced by the illustrated scale of the insurer whose policy is being illustrated." 28 TEX. ADMIN. CODE § 21.2206(2)(E). An "illustrated scale" is "a scale of non-guaranteed elements currently being illustrated that is not more favorable to the policy owner than the lesser of: (A) the disciplined current scale; or (B) the currently payable scale." 28 Tex. Admin. Code § 21.2204. Section 21.2212 provides:

> Any violation of this subsection shall constitute a misrepresentation of the terms of an issued and unissued policy in violation of the Insurance Code, Article 21.21 § 4(1) and (2), and to be a misrepresentation of the terms, benefits, and advantages of a policy within the meaning of the Insurance Code, Article 21.20. Violations of this subsection shall subject the insurer and agent to the penalties provided in the Insurance Code, Article 21.21 and other applicable provisions of the Insurance Code.

(28 Tex. Admin. Code § 21.2212). Tex. Ins. Code § 541.061 (formerly Article 21.21) provides:

> It is an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to misrepresent an insurance policy by:
> (1) making an untrue statement of material fact;
> (2) failing to state a material fact necessary to make other statements made not misleading, considering the circumstances under which the statements were made;
> (3) making a statement in a manner that would mislead a reasonably prudent person to a false conclusion of a material fact;
> (4) making a material misstatement of law; or
> (5) failing to disclose a matter required by law to be disclosed, including failing to make a disclosure in accordance with another provision of this code.

(Tex. Ins. Code Ann. § 541.061). The Texas Insurance Code provides a private right of action for violations of § 541.061. *See* Tex. Ins. Code § 541.151.

Plaintiffs allege that the illustrations provided in 2010 projected a COI charge of 1.4% per month for the period from 3/19/2018–3/18/2019. (CC ¶ 114.) The new illustration, after the COI increase, projected a COI charge of 2.0% per month for that same period. (CC.¶ 114.) Plaintiffs allege that the 1.4% illustrations "depicted performance more favorable to the policy holder" in violation of Rule 21.2206(2)(E). Plaintiffs only allege that use of the disciplined current scale could not have depicted the performance it did, because Defendant's expectations "could not have changed…in a large enough manner to justify such a massive increase." (CC ¶ 114.) Plaintiffs allege this based on Defendants representation that "their illustrations were based on their current expected future expenses." (CC ¶ 113.) Plaintiffs' allegation is conjectural and Plaintiffs do not provide facts as to why the illustrations could not have depicted the performance as it did. Instead, Plaintiffs make conclusory statements that Defendants' expectations could not have changed in a large enough manner to justify the increase. (CC ¶ 114.) Plaintiffs will be allowed to amend their complaint to allege facts that support this claim.

Defendants argue that Plaintiffs have not pled injury. (Defs.' Mem., at 32.) Plaintiffs have done so by alleging that the "misleading illustrations caused US Life to pay more in premiums than it otherwise would have." (CC ¶ 114.) As they assert, if Policyholders were "aware of the massive COI increases that would be imposed in the last years for which premiums were due, that would have significantly changed their calculus about whether to continue paying premiums or cash out or surrender their policies." (Pls.' Resp. in Opp. at 42.)

## C.

In Count eight, Plaintiffs assert claims for violations of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq.* (the "NJCFA"). The NJCFA prohibits "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . ." N.J. Stat. Ann. § 56:8-2. To state a claim under the NJCFA, plaintiffs must allege "(1) an unlawful practice; (2) an ascertainable loss; and (3) a causal relationship between the unlawful conduct and the ascertainable loss." *Gonzalez v. Wilshire Credit Corp.*, 25 A.3d 1103, 1115 (N.J. 2011) (citation omitted).

As with North Carolina's UDTPA, "a mere breach of contract, without more, is not sufficient to support a claim under NJCFA," *Hunt Constr. Grp., Inc. v. Hun Sch. of Princeton*, 2009 WL 1312591, at *4 (D.N.J. May 11, 2009); *accord Barry v. N.J. State Highway Auth.*, 585 A.2d 420, 423-24 (N.J. 1990), and a plaintiff must allege that the breach was accompanied by "substantial aggravating circumstances." *Nickerson v. Quaker Grp.*, 2008 WL 2600720, at *13-14 (N.J. Ct. App. July 3, 2008).

For the same reasons discussed in Subpart IX.A, Plaintiffs allegations are sufficient to state a claim. *See, e.g., Petri Paint Co. v. Omg Ams., Inc.*, 595 F. Supp. 2d 416, 421 (D.N.J. 2008) (breach of contract accompanied by bad faith or

lack of fair dealing constitutes a substantial aggravating circumstance); *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 463 (N.J. 1994) (same).

## D.

In Count nine, Plaintiffs assert a claim for violation of New York General Business Law § 349.  (CC ¶¶ 127–33.) Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service. . ." (N.Y. GEN. BUS. LAW § 349).  To state a claim under Section 349, a plaintiff must demonstrate: (1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result.  *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) (citing *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000)).  Claims brought under Section 349 are not subject to a heightened pleading-with-particularity requirement set forth in Rule 9(b).  *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005).

Defendants contend that Plaintiffs failed to "identify deceptive conduct." (Defs.' Mem., at 37.)  Whether an act or practice is deceptive "is usually a factual question."  *Fero v. Excellus Health Plain, Inc.*, 236 F. Supp. 3d 735, 775–76 (W.D.N.Y. 2017) (citing *Quinn v. Walgreen Co.*, 958 F. Supp. 2d 533, 543 (S.D.N.Y. 2013)); *see also Buonasera v. Honest Co., Inc.*, No. 16 Civ. 1125 (VM), 208 F. Supp. 3d 555, 566 (S.D.N.Y. 2016) ("Courts have generally held that since this second factor requires a reasonableness analysis, it cannot be resolved on a motion to dismiss.").

A "deceptive act or practice" is "a representation or omission likely to mislead a reasonable consumer acting reasonably under the circumstances." *Gaidon v. Guardian Life Ins. Co. of Am.*, 725 N.E. 2d 598 (N.Y. 1999). In *Gaidon*, plaintiffs contended that "vanishing" premium (which go away or vanish within a stated period of time) illustrations "were premised on dividend projections that Guardian knew or should have known were untenable." 725 N.E. 2d at 600. Plaintiffs also alleged that defendants "lured them into purchasing policies by using illustrations that created unrealistic expectations as to the prospects of premium disappearance upon a strategically chosen 'vanishing date.'" *Id.* at 604. The plaintiffs asserted that defendants "allegedly knew or should have known" that it was unlikely that interest rates would continue at a high rate. *Id.* The defendants relied on a disclaimer in the policies stating that the illustrated rates were not guaranteed nor estimates of future results, but the court stated that consumers vary in levels of sophistication and concluded that the plaintiffs alleged enough to state a claim under Section 349. *Id.*; *id.* at 606.

In this case, Plaintiffs allege that Defendants hid the increase through misleading illustrations "to induce policyholders to continue paying premiums under false pretenses." (CC ¶ 131.) Drawing all reasonable inferences in Plaintiff's favor, the allegations are sufficient to state a claim. The illustrations provided to Plaintiffs "in at least 2014 and 2016 showed improperly favorable non-guaranteed elements and illustrated non-guaranteed elements in a misleading manner, if Lincoln's story is to be believed." (CC ¶ 131.) "There has

been no change for the worse in mortality, or other experience factors, between the time of those illustrations and the time of the increase that would justify such a massive change in Lincoln's expected future costs." (CC ¶ 131.) Plaintiffs contend that an objectively reasonable policyholder would assume that the illustrations "accurately reflected Defendants' current, reasonable assumptions about future increases." (Pls.' Resp. in Opp., at 44.)

Defendants also argue that Plaintiffs claim fails for lack of injury. (Defs.' Mem., at 36.) When a plaintiff asserts a breach of contract claim and a Section 349 claim in the same case, the alleged monetary loss from the Section 349 claim "must be independent of the loss caused by the alleged breach of contract." *Spagnola*, 574 F.3d at 74; *see also e.g.*, *Yang Chen v. Hiko Energy, LLC*, No. 14 CV 1771 VB, 2014 WL 7389011, at *5 (S.D.N.Y. 2014) (Plaintiffs alleged damages as a result of the defendant's breach of contract and also alleged that they would not have switched from the prior electricity and gas supplier had the defendant not deceived them. Those losses are distinct from the breach of contract losses.).

Plaintiffs have adequately alleged independent losses. The "breach of contract claims rest upon payments <u>after</u> the increase or Policyholders being forced to surrender or cash out policies prematurely." (Pls.' Resp. in Opp., at 43–44.) Plaintiffs allege alternatively that Lincoln "has hidden this increase for a long time through misleading illustrations designed to induce policyholders to continue paying premiums under false pretenses. These misleading illustrations caused Zirinsky to pay more in premiums than he otherwise would have." (CC ¶

130.) Plaintiffs allege that the premium payments made before the COI increase "would not have been made if Policyholders had been provided with an accurate picture of the impending rate increases that Lincoln is alleged, in the alternative, to have known would be imposed." (Pls.' Resp. in Opp., at 42.)  As in *Yang Chen*, Plaintiffs may not have chosen Lincoln had they not been deceived.

**E.**

In Count ten, Plaintiffs assert claims for violations of the California Business and Professional Code §§ 17200, *et seq.* (the "UCL").  To state a claim under § 17200, a plaintiff must allege an "unlawful, unfair, or fraudulent business act or practice."  *See id.*  "Because [the UCL] is written in the disjunctive, it establishes three varieties of unfair competition – acts or practices which are unlawful, or unfair, or fraudulent."  *Feller*, 2016 WL 6602561, at *13 (citation omitted).  Here, Plaintiffs allege that Defendants violated the UCL by engaging in conduct that was "unlawful" and "unfair."  (CC ¶¶ 60, 135.)

To state a claim based on an "unfair" practice, the plaintiff must allege facts supporting that the practice "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal.App. 4th 700, 719 (2001) (internal quotation marks and citation omitted).  A business practice may be "unfair" even if not specifically proscribed by some other law. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1143 (2003). For the same reasons discussed *supra* in Subpart IX.A, Plaintiffs' allegations that Lincoln has used the COI rate increase to force Policyholders to subsidize its own

interest guarantees, recoup its past losses and force "shock lapses" falls squarely within the ambit of the statute. *See, e.g., Feller*, 2016 WL 6602561, at *13-14 (California court sustaining "unfair" prong claim premised on wrongful increase in COI rates).

**F.**

In Count eleven, Plaintiff Mindlin and the California Sub-Class members aged 65 years or older assert a claim for violations of the California Elder Abuse Statute. The statute defines "elder" as "any person residing in this state, 65 years of age or older" and provides in part:

> (a) "Financial abuse" of an elder or dependent adult occurs when a person or entity does any of the following:
>
>> (1) Takes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both.
>>
>> (2) Assists in taking, secreting, appropriating, obtaining, or retaining real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both.

Cal. Welf. & Inst. Code § 15610.30 (a). Plaintiffs allege that each member of the California Sub-Class was 65 years or older and residents of California when the policy was issued. (CC ¶ 142.) The law only requires that a defendant "know or should know their wrongful conduct is likely to harm an elder" rather than purposely target an elder. *Feller v. Transamerica Life Insurance Co.,* 2016 WL 6602561, at *15 (C.D. Cal. 2016).

40

Defendants argue that a claim under the California Elder Abuse Statute must satisfy the Rule 9(b) heightened pleading requirement, requiring allegations of fraud to be stated with particularity. Fed.R.Civ.P. 9(b). Allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir. 1985). "Averments of fraud must be accompanied by "the who, what, when, where, and how" of the misconduct charged." *Vess v. Ciba–Geigy Corp., USA,* 317 F.3d 1097, 1107 (9th Cir. 2003). Plaintiffs "may aver scienter generally, just as the rule states—that is, simply by saying that scienter existed." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547 (9th Cir. 1994), *superseded by statute on other grounds as stated in SEC v. Todd,* 642 F.3d 1207, 1216 (9th Cir. 2011).

California Elder Abuse claims "grounded in fraud" are subject to a heightened pleading standard. *See Vess v. Ciba–Geigy Corp., USA,* 317 F.3d 1097, 1103–04 (9th Cir. 2003) ("In cases where fraud is not a necessary element of a claim, a plaintiff may choose nonetheless to allege in the complaint that the defendant has engaged in fraudulent conduct. In some cases, the plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim. In that event, the claim is said to be "grounded in fraud" or to "sound in fraud," and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b).")

In addition to prohibiting actions with the intent to defraud, the California Elder Abuse Statute prohibits actions "for a wrongful use": A person or entity shall be deemed to have taken, secreted, appropriated, obtained, or retained property for a wrongful use if, among other things, the person or entity takes, secretes, appropriates, obtains, or retains the property and the person or entity knew or should have known that this conduct is likely to be harmful to the elder or dependent adult.  Cal. Welf. & Inst. Code § 15610.30 (b).

Plaintiffs initially are not clear in their complaint as to whether Defendants acted "for a wrongful use" or "with intent to defraud" because they simply restate the words of the statute. (CC ¶ 145.)  Plaintiffs then allege "Defendants are guilty of oppression, fraud, and malice…" indicating the claim is grounded in fraud. (CC ¶ 146.)  Drawing inferences in the light most favorable to Plaintiffs as the Court must at this stage, Plaintiffs have met the heightened pleading requirement of 9(b).  Plaintiffs allege that "[u]nder the language of the policies, Defendants offered flexible premiums that would allow policyholders to fund only enough premiums to cover the monthly deductions, that the Company would not raise the COI Rate and consequent Monthly Deduction except based on certain anticipated future expense factors stated in the policies and as, acknowledge by its NAIC filings, would not raise the cost of insurance in order to recoup past losses." (CC ¶ 136.) These representations were made in the Policies themselves, on Defendants' website, marketing materials and press releases, and responses to the NAIC.  (CC ¶ 136.)  Subsequently, Defendants increased "COI Rates in order to recoup past losses despite assurances and representations that

it would not do so, and [did] so as part of an unfair and deceptive scheme designed to force policy lapses by virtue of burdensome premium increases – a tactic known as "shock lapses." (CC ¶ 137.)

Defendants argue that Plaintiff Mindlin does not have standing because Plaintiff is the Trust (through its trustee), rather than Allen I. Mindlin, the insured (Defs.' Mem. at 42; Defs.' Reply at 20.) In *Mahan v. Charles W. Chan Insurance Agency, Inc.*, No. A147236, 2017 WL 3614276, at *1 (Cal. Ct. App. 2017), the plaintiffs were the Mahans (whose lives were insured under two life insurance policies) and the trustee of the trust that held the policies. The defendants argued that the only proper plaintiff was the trust, which was not 65 years old. *Id.* The plaintiffs did not allege that the individuals suffered a harm, but alleged that the trust did and the court dismissed the claim for failure to allege a deprivation of property. *Id.* at *2.

The Court of Appeals reversed because the defendants' alleged scheme drained cash from the trust due to the annual insurance premium increase. *Id.* at 6. Additionally, the Mahans needed to put more money into the trust to pay the insurance premiums and interest to prevent the policies from lapsing. *Id.* The court noted that "a remedial statute is to be liberally construed on behalf of the class of persons it is designed to protect." *Id.* at *11. Because the defendants' misconduct "made the donation or voluntary transfer of the Mahans' chosen gift assets in their estate plan much more expensive and of lesser value, [their] right to dispose of their property has been damaged." *Id.* at *12. The court noted that the adverse financial consequences flowing from the defendants' actions "could

not be awarded twice in damages, both to the Trust and to the Mahans" but that the damages apportionment issues must be dealt with not as a matter of pleading, but as a matter of proof. *Id.* at *13. Here, The Mindlin Irrevocable Trust holds a policy insuring the life of Allen I. Mindlin. (CC ¶ 11.) The Complaint fails to allege whether the trust or Allen I. Mindlin funded the increased premiums and Plaintiffs will be allowed to amend the complaint accordingly.

Finally, Defendants argue that Plaintiff Mindlin is not permitted to seek punitive damages under California Civil Code § 3294(a) because the Elder Abuse claim "is premised on the same allegations underlying the breach of contract claim." (Defs.' Mem. at 43.) California courts have held that punitive damages should not be granted in actions based on breach of contract though they may be recovered in a tort action upon a showing of malice, fraud or oppression even though the tort incidentally involves a breach of contract. *Crogan v. Metz*, 47 Cal. 2d 398, 405 (1956); *Chelini v. Nieri*, 32 Cal. 2d 480, 486–87 (1948) ("It has long been settled that "Under this section exemplary damages may not be recovered in an action based upon a contractual obligation even though the breach of contract is willful or malicious. If on the other hand the action is one in tort, exemplary damages may be recovered upon a proper showing of malice, fraud or oppression even though the tort incidentally involves a breach of contract.'"). As stated above, Plaintiffs have satisfied the heightened pleading requirement required for claims of fraud, encompassed in the allegation of the violation of the California Elder Abuse Statute.

An appropriate order follows.

BY THE COURT:

**_/s/ Gerald J. Pappert_**

GERALD J. PAPPERT, J.