# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| ) | No.: 16-cv-06605-GJP |
| ) |  |
| ) |  |
| IN RE: LINCOLN NATIONAL COI ) | **SECOND AMENDED** |
| LITIGATION ) | **CONSOLIDATED CLASS** |
| ) | **ACTION COMPLAINT** |
| ) |  |
| ) | **JURY TRIAL DEMANDED** |

**BARRACK, RODOS & BACINE**
Jeffrey W. Golan
Robert A. Hoffman
Lisa M. Port
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600

and

Stephen R. Basser
One America Plaza
600 W. Broadway, Suite 900
San Diego, CA 92101
Telephone: (619) 230-0800

**BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.**
Andrew Friedman
Kimberly Page
Francis J. Balint, Jr.
2325 E Camelback Rd #300
Phoenix, AZ 85016
Telephone: (602) 274-1100

**SUSMAN GODFREY L.L.P.**
Steven G. Sklaver
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone:  (310) 789-3100

and

Seth Ard
Jillian Hewitt
Lucas Issacharoff
1301 Avenue of the Americas
32nd Floor
New York, NY  10019
Telephone:  (212) 336-8330

**KOZYAK TROPIN &
THROCKMORTON**
Gail A. McQuilkin
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, FL 33134
Telephone: (305) 372-1800

*Plaintiffs' Steering Committee*

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ................................................................................... 1

THE PARTIES......................................................................................................... 3

    A.    Plaintiffs ...................................................................................... 3

    B.    Defendants .................................................................................. 8

JURISDICTION AND VENUE ............................................................................. 9

FACTUAL BACKGROUND ................................................................................. 10

    A.    The Policies at Issue................................................................... 10

    B.    Lincoln's COI Increases ............................................................. 14

    C.    The COI Increases Are Unlawful ............................................... 14

        1.    The COI Increases Were Not Based on the
                Enumerated Factors ....................................................... 14

        2.    The COI Increases Operate to Recoup Past Losses ................... 18

        3.    The COI Increases Were Not Uniform .................................... 21

        4.    Lincoln Refuses to Provide Illustrations of Policies in
                Their Grace Periods upon Request ........................................... 22

2016 COI INCREASE CLASS ACTION ALLEGATIONS ...................................... 23

ILLUSTRATION GRACE CLASS ACTION ALLEGATIONS.................................. 25

FIRST CLAIM FOR RELIEF
Breach of Contract against Lincoln
(on behalf of Plaintiffs and the 2016 COI Increase Class) .......................................... 26

SECOND CLAIM FOR RELIEF
Breach of the Implied Covenant of Good Faith and Fair Dealing
(on behalf of Plaintiffs and the 2016 COI Increase Class) .......................................... 27

THIRD CLAIM FOR RELIEF
Injunctive Relief as to Illustrations in Grace Period
(on behalf of Plaintiffs and the Illustration Grace Class) .......................................... 28

i

FOURTH CLAIM FOR RELIEF
Injunctive Relief as to COI Increases
(on behalf of Plaintiffs and the 2016 COI Increase Class) ........................................................ 29

FIFTH CLAIM FOR RELIEF
Declaratory Relief
(on behalf of Plaintiffs and the 2016 COI Increase Class) ........................................................ 30

SIXTH CLAIM FOR RELIEF
Violations of the North Carolina Deceptive and Unfair Trade
   Practices Act, N.C. Gen. Stat. § 75-1, *et seq.*
(on behalf of Plaintiffs and the 2016 COI Increase Class) ........................................................ 31

SEVENTH CLAIM FOR RELIEF
Violations of 28 Tex. Admin. Code §§ 21.2206 to 21.2212,
   Tex. Ins. Code art. 21.21
(on behalf of US Life and the Texas Sub-Class) ........................................................ 32

EIGHTH CLAIM FOR RELIEF
Violations of the New Jersey Consumer Fraud Act,
   N.J. Stat. Ann. § 56:8-1 *et seq.*
(on behalf of Bharwani, Milgrim and the New Jersey Sub-Class) ................................................ 36

NINTH CLAIM FOR RELIEF
Violations of General Business Law § 349
(on behalf of Zirinsky and the New York Sub-Class) .................................................. 37

TENTH CLAIM FOR RELIEF
Violations of California Unfair Competition Law,
   Cal. Bus. & Prof. Code §§ 17200 *et seq.*
(on behalf of the Mindlin and Valentine Plaintiffs and the California Sub-Class)...................... 39

ELEVENTH CLAIM FOR RELIEF
Violations of California Elder Abuse Statute,
   Cal. Welf. & Inst. Code §§ 15610 *et seq.*
(on behalf of the Mindlin and Valentine Plaintiffs and the California Sub-Class)...................... 40

TWELFTH CLAIM FOR RELIEF
Tortious Breach of the Duty of Good Faith and Fair Dealing
(on behalf of the Mindlin and Valentine Plaintiffs and the California Sub-Class)......................42

PRAYER FOR RELIEF ...................................................................... 44

DEMAND FOR JURY TRIAL .................................................... 44

Plaintiffs Robert Rombro and Harriet Kanter, as Trustees for the Alan Norman Kanter Trust (the "Kanter Plaintiffs"); Ivan Mindlin, as Trustee of the Mindlin Irrevocable Trust (the "Mindlin Plaintiff"), and Alan Mindlin, as the insured who funded the policies; Laura Weinstein and Richard Weinstein, as co-owners of a life insurance policy insuring the life of Jay Weinstein (the "Weinstein Plaintiffs"); Lowell Rauch and Carol Anne Rauch (the "Rauch Plaintiffs"); Bharti R. Bharwani; Robert A. Zirinsky; Barry Mukamal, as Trustee of the Mutual Benefits Keep Policy Trust; US Life 1 Renditefonds GmbH & Co. Kg ("US Life 1") and US Life 2 Renditefonds GmbH & Co. Kg ("US Life 2"; together, "US Life"), as owners of life insurance policies insuring the life of Loucille Martindale; Milgrim Investments, LP ("Milgrim"), a New Jersey Limited partnership; and Barbara Valentine, on behalf of themselves and all others similarly situated, for their Complaint against Defendants Lincoln National Corporation ("Lincoln National") and The Lincoln National Life Insurance Company ("Lincoln Life"; together, "Lincoln," "Lincoln Defendants," or "Defendants"), state as follows:

## NATURE OF THE ACTION

1.     This is a class action brought by Plaintiffs on behalf of themselves and all similarly situated owners of JP Legend 300, and JP Lifewriter Legend 100, 200, and 400 series life insurance policies (each a "JP Legend policy") issued by Jefferson-Pilot Corporation ("Jefferson-Pilot").  Defendant Lincoln National is the successor-in-interest to Jefferson-Pilot. In that capacity and in conjunction with Lincoln Life, the Lincoln Defendants have subjected the plaintiff owners to unlawful cost of insurance ("COI") increases.

2.     The policies at issue are all universal life policies (collectively, "UL") issued by Jefferson-Pilot and its affiliated entities ("JP policies").  The principal benefit of UL policies is that, unlike other kinds of whole life insurance that require fixed monthly premium payments,

1

the premiums required for UL policies are flexible and need only be sufficient to cover the COI charges and certain other specified expenses.  The COI charge is typically the highest expense charge that a policyholder pays.  As a result, the provision in the policy explaining how and when COI charges can be adjusted is one of the most important terms of the contract.

3.       On information and belief, each JP Legend policy in these series states that COI "will be based on our expectation of future mortality, interest, expenses, and lapses," and that "any change" in COI rates "will be on a uniform basis for Insureds of the same rating class." Also on information and belief, each JP Legend policy in these series states that "upon request, we will provide, without charge, an illustration showing projected policy values based on guaranteed as well as current mortality and interest factors."

4.       One principal benefit of UL policies is they permit policyholders to pay the minimum amount of premiums necessary to keep the policies in-force.  This allows policyholders to minimize their capital investment and generate greater rates of return through other investments.  Any premiums paid in excess of COI charges and expense components are applied to a policy's "accumulation account," sometimes known as "policy account" or "cash value." These excess premiums earn interest, often called the credited rate.

5.       In or around August and September 2016, Lincoln informed owners of JP policies that they would be hit by a COI rate hike (the "JP-Lincoln COI Rate Hike").  Plaintiffs' COI increases generally appear to have ranged from roughly 50% to roughly 95% – far beyond what the enumerated policy factors permit.  The increase also was not uniform among policyholders.

6.       Lincoln's FAQ sheet distributed to agents indicated three reasons for the increase: "Lower investment income as a result of continued low interest rates"; "Updated mortality assumptions, including instances of both higher and lower expected mortality rates versus prior

expectations"; and "Updated expenses, including higher reinsurance rates." Yet these factors do not justify the sharp, disparate, and unusually distributed increases imposed upon Plaintiffs. Also, in or around at least 2010 through 2014, Lincoln provided certain of the Plaintiffs with illustrations, which reflected no change in future COI rates. Since that date Lincoln has filed interrogatories with the National Association of Insurance Commissioners ("NAIC"), in each year from 2010-2014, stating that it expects mortality experience to improve.

7.      The JP-Lincoln COI Rate Hike breached the contracts underlying the JP policies in at least the following respects:

- Increases were based upon non-enumerated prohibited factors;

- Increases were designed to recoup past losses rather than respond to future expectations;

- Increases were non-uniform across insureds of the same rating class; and

- Lincoln refused to provide an illustration on a policy upon request, which it was required to do even in the absence of a COI rate hike.

8.      Additionally, Jefferson-Pilot and Lincoln, as its successor, broke state laws governing misleading advertisement of unrealistic future COI rates, given that it imposed increases that were unjustified by changes in future expectations.

## THE PARTIES

### A.      Plaintiffs

9.      Plaintiff US Life 1 Renditefonds GmbH ("US Life 1") is a limited liability company registered in Hamburg, Germany. It is the owner of a JP policy insuring the life of Ms. Martindale, a Texas resident, on or about March 19, 2003, with the policy number JP5486401. Plaintiff US Life 2 Renditefonds GmbH ("US Life 2"; together, the "US Life Plaintiffs") is a

limited liability company registered in Hamburg, Germany.  It is the owner of another JP policy insuring the life of Ms. Martindale, with the policy number JP5480110.  These Policies are a split of an original larger JP policy, and they both have identical terms.  The US Life plaintiffs have received an illustration which implies a COI rate of 2.4% per month in policy year 15 (the period from 3/19/2017 to 3/18/2018) at the end of which the insured will be 98 years old.  This COI rate is greater than the COI rate implied by the same illustration of 2.0% per month for policy year 16 (the period from 3/19/2018 to 3/18/2019) at the end of which she will be 99 years old.  Greater COI charges at younger ages are illogical and, upon information and belief, have not been replicated across all policyholders of the same rating class.  While Plaintiffs US Life have been informed that their policies lapsed in January 2017 without the payment additional premiums incorporating the unlawfully high COI rate, Plaintiffs US Life again hereby represent to the Court their intent to maintain the policies at the **lawful** COI rate, and constructively tender to the Court sufficient funds to make such payments.

10.     Plaintiffs Robert Rombro and Harriet Kanter (the "Kanter Plaintiffs") are residents of Maryland and Trustees for the Alan Norman Kanter Lifetime Trust dated June 6, 1988, which holds in trust a JP policy insuring the life of Alan Kanter, with the policy number JP5242906.  This policy was issued on June 14, 2002, with a face amount of $2,000,000.

11.     Plaintiff Ivan Mindlin, in his capacity as Trustee of the Mindlin Irrevocable Trust dated December 30, 1976 (a "Mindlin Plaintiff") is a trustee of the Mindlin Irrevocable Trust, which holds in trust a JP policy insuring the life of Plaintiff Allen I. Mindlin, with the policy number JC5169204.  On January 9, 2001, Jefferson Pilot issued JP Legend 100 policy number JC5169204 with a face amount of $2,000,000, insuring the life of Allen I. Mindlin, age 68 at the time of issue, and designating the Mindlin Irrevocable Trust dated December 30, 1976, Ivan

4

Mindlin, Trustee, as the owner.  The policy was issued in the state of California.  On September 6, 2016, Mindlin received notice stating that the COI rate was increasing, which would cause a commensurate increase in the premiums required to maintain the same level of coverage and keep the policy in force for the same duration as prior to the increase.  Allen Mindlin was 84 years old at the time of COI increase, and a resident of California throughout all relevant times (collectively with Ivan Mindlin as trustee, the "Mindlin Plaintiffs").  Along with the notification of the increase, the Mindlin Plaintiffs received an illustration showing the projected performance of the policy under non-guaranteed and guaranteed assumptions.  The illustration demonstrates that the COI increases will have a devastating impact on his Policy, rendering it all but worthless in a very short time absent paying a twenty-five percent increase in the premiums paid.

12.     Plaintiffs Laura Weinstein and Richard Weinstein (the "Weinstein Plaintiffs") are residents of Georgia and co-owners of a JP policy insuring the life of Jay Weinstein, who was 61 years old, with the policy number JC5219143.  This policy was issued on December 4, 2001, with a face amount of $1,000,000.

13.     Plaintiff Carol Anne Rauch is a resident and citizen of the state of North Carolina.  Plaintiff Lowell Rauch is a resident and citizen of the state of North Carolina.  The Rauch Plaintiffs are the owners of a JP policy with the policy number JG5265824, which was issued in North Carolina on November 12, 2002, insuring the life of Lillian Rauch, with a face amount of $800,000.  The Rauch Plaintiffs received a letter dated September 6, 2016 stating that the COI rate was increasing, which would cause a commensurate increase in the premiums required to maintain the same level of coverage and keep the policy in force for the same duration as prior to the increase.  On September 23, 2016, the Rauch Plaintiffs received another letter attaching an updated illustration showing the projected performance of her policy under non-guaranteed and

guaranteed assumptions. The illustration demonstrates that the COI increases will have a devastating impact on the Rauch Plaintiffs' Policy, rendering it all but worthless in a very short time without a significant additional cash outlay for the remainder of the in-force time period. As demonstrated by documents that Lincoln has sent to the North Carolina Insurance Department, the charge for Plaintiffs' cost of insurance rose by nearly 85% between October and November 2016.

14.     Plaintiff Bharti R. Bharwani ("Bharwani") is a 52-year-old individual who, at all times material hereto, was and is a domiciliary of the State of New Jersey and currently resides in Parsippany, New Jersey. On or about April 28, 2003, Jefferson-Pilot, from its home office in Greensboro, North Carolina, issued to Ms. Bharwani, as both the owner and the insured, a JP Legend 300 policy insuring her life with the policy number JF5281615, with a face amount of $500,000. On or about October 28, 2016, Defendants notified Ms. Bharwani that the monthly deduction amount to be withdrawn from her policy value resulting from the COI rate increase was increasing. As a result of this increase, the old premium was $4,700 per year that would be paid off at age 65, and the new premium is $5,085 per year that would be paid off at age 100.

15.     Plaintiff Robert A. Zirinsky ("Zirinsky") is a 64-year-old individual who, at all times material hereto, was and is a domiciliary of the State of New York and currently resides in New York, New York. On or about February 27, 2003, Jefferson-Pilot, from its home office in Greensboro, North Carolina, issued to Mr. Zirinsky, as both the owner and the insured, a JP Legend 400 policy insuring his life with the policy number JF5282388, with a face amount of $1,250,000, which was thereafter increased to $1,788,340.58, effective June 27, 2014. On or about September 13, 2016, Defendants notified Plaintiff Zirinsky that the monthly deduction amount to be withdrawn from his policy value resulting from the COI rate increase was

increasing, which effected a consequent increase of the annual premiums necessary to maintain coverage from $186.55 per year to $4,203.00 for the current policy period.

16.     Plaintiff Milgrim Investments, LP ("Milgrim") is a New Jersey limited partnership with its principal place of business in Cherry Hill, New Jersey.  Milgrim owns JP Legend 300 policy JP5179240, which was issued in New Jersey on January 15, 2002, in the face amount of $500,000.  On or about September 6, 2016, Defendants issued notice that the monthly deduction amount to be withdrawn from the policy value resulting from the COI rate increase was increasing, which effected a consequent increase of the annual premiums necessary to maintain coverage from $4,669.00 per year to $17,077.42 for the current policy period, in addition to other adverse changes.

17.     Plaintiff Barry Mukamal ("Mukamal") is a resident of Florida and Trustee of the Mutual Benefits Keep Policy Trust,[1] located at 43 S. Pompano Parkway, Pompano Beach, Florida 33069.  The Trust owns a beneficial interest in the following JP Legend policies: JP5214933, JP5214932, JG5277074, JP5216209, and JP5218293 (the "Mukamal policies"), with varying face amounts ranging from $600,000 to $2,400,000.  The policies were issued in Florida. As a result of and subsequent to Defendants' September 2016 notification to Trustee Mukamal that the COI rates associated with the policies under his ownership and control were increasing

---

[1] The Mutual Benefits Keep Policy Trust was created in connection with an S.E.C. receivership of Mutual Benefits Corporation.  Mutual Benefits was a company which sold investments in viatical insurance contracts, a transaction whereby an insured desires to sell the beneficial interest in a life insurance policy in order to receive cash, and the investor provides such funds in exchange for an interest in the death benefit of the policy.  Mutual Benefits would take ownership of a policy and assign fractional interests in the death benefit to multiple investors.  Mutual Benefits was placed into an S.E.C. receivership due to improprieties in the sale of the interests to investors.  In May 2004, the United States District Court for the Southern District of Florida appointed a receiver for Mutual Benefits to protect the interests of the investors who invested in the Policies.  The receiver, with the Court's approval, transferred all of the life insurance policies owned by Mutual Benefits to the Mutual Benefits Keep Policy Trust, and authorized the appointment of Barry Mukamal as Trustee.  As Trustee, Mr. Mukamal serves as the owner and nominal beneficiary of the Policies in which thousands of investors hold interests, including the Policies at issue in this case.  The Trustee is responsible for maintaining and administering the Policies for the benefit of the investors, including paying all premiums due, collecting funds from the investors to pay premiums, and taking all steps necessary to minimize the expense to the investors and maximize investor returns from the Policies.

effective October 9, 2016, the monthly amounts to be withdrawn from the policies increased, effecting a consequent spike in annual premiums necessary to keep the policies in force and effect.  For example, the COI rate applicable to policy JP 5214933 increased by 68%, which nearly doubled the monthly deduction from $15,922 to $31,085.

18.     Plaintiff Barbara M. Valentine ("Valentine") is a resident of California and trustee of the Barbara M Valentine Living Trust, which owns a JP Legend 300 Policy insuring her life, for which she pays the premiums.  The policy, bearing the number JG5240036, was issued to Valentine on June 15, 2002, in the state of California, when she was 64 years old.  She was 78 at the time of the COI increase that impacted her policy and massively increased her COI rate.

### B.     Defendants

19.     Defendant Lincoln National Corp. has its home office and principal place of business at 150 North Radnor-Chester Rd., Radnor, Pennsylvania 19087.  Lincoln National is and has been at all times material a corporation organized under Indiana law.  Lincoln National acquired Jefferson-Pilot for about $7.5 billion in cash and stock in a merger consummated in 2006.  Headquartered in Philadelphia, Pennsylvania, the combined company is one of the largest publicly traded life insurance companies in the United States of America.  Lincoln National's most senior executives – its CEO and CFO – both came to Lincoln from Jefferson-Pilot. Lincoln National is the parent of its subsidiary, Defendant Lincoln National Life Insurance Company.  Lincoln Financial Group is the marketing name for Lincoln National and its affiliates. As a result of the merger of Lincoln National and Jefferson-Pilot in 2006, on information and belief, all of Jefferson-Pilots' insurance policies that are the subject of this lawsuit were absorbed, owned and controlled by the combined company, Lincoln National, which sold and

operated its universal life insurance products through its subsidiary Lincoln Life and Lincoln National's marketing arm doing business as Lincoln Financial Group.

20.     Defendant Lincoln National Life Insurance Company is a life insurance company incorporated under the laws of Indiana, with a principal place of business in Radnor, Pennsylvania, as reflected in its own judicial filings in this District.  It sent the letters regarding the 2016 JP-Lincoln COI Rate Hike on the affected policies.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(d) and 28 U.S.C. §1332(a)(2) because this is a class action with diversity between at least one class member – the named plaintiffs are citizens of a foreign state and other states beyond Indiana and Pennsylvania – and one defendant, and the aggregate amount of damages exceeds $5,000,000; and because the plaintiffs are residents of a foreign state and the amount in controversy exceeds $75,000.  This action therefore falls within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28 U.S.C § 1332(d) and 28 U.S.C. § 1332(a)(2).

22.     This Court has general personal jurisdiction over the Lincoln Defendants because both entities maintain their principal places of business in this District.  This Court also has specific personal jurisdiction because many of the acts and decisions giving rise to this suit occurred in this District, and thousands of members of the proposed class likely reside in this district.

23.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because the Lincoln Defendants reside in this district, and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this

District, including Lincoln's issuance of the 2016 JP-Lincoln COI Rate Hike.   In addition, venue is proper in this District under 28 U.S.C. § 1391 because Defendants maintain a business headquarters, business agents and operatives in this District; many thousands of Class Members either reside or did business with Jefferson-Pilot or the Defendants in this District; Defendants have engaged and continue to engage in business in this District; Lincoln National maintains its corporate headquarters in this District, which includes an investment department through which Lincoln National's investment decisions were initiated, rendered, engaged, approved or otherwise ratified in this District; Lincoln Life's written responses to NAIC interrogatories were, at all times material, vetted and approved by Lincoln National in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and Defendants entered into transactions and received substantial profits from policyholders who reside in this District.

## FACTUAL BACKGROUND

### A.     The Policies at Issue

24.     The policies at issue are UL policies issued by Jefferson-Pilot, which Lincoln says were issued between 1999 and 2007.   These policies are all flexible-premium, universal life policies, and there are no fixed or minimum premium payments specified in the policies.

25.     Universal life policies combine aspects of term life insurance (life insurance policies that pay a benefit in the event of the death of the insured during a specified term) with a interest-bearing account into which premium payments are made.   As a result, policyholders are able to adjust allocations of their contributions between the "term life insurance" component of their policy and the savings or investment component of their policy.

26.     In addition, policyholders can adjust both the amount and frequency of their premium payments so long as the policy value is sufficient to cover the monthly deductions in connection with the "cost of insurance" (COI) charges, as well as a small administrative fee.

27.     Lincoln determines the cost of insurance charge (which the policies call a "Monthly Deduction") on a monthly basis as the cost of insurance rate for the month, multiplied by the number of thousands of 'net amount at risk' for the month.  The so called "net amount at risk" for a month is computed as the "death benefit for the month before reduction for any indebtedness, discounted to the beginning of the month at the guaranteed rate," less "the policy value at the beginning of the month."

28.     Small changes in the Cost of Insurance rate ("COI Rate") can produce a dramatic increase in the dollar amount of the Monthly Deduction charged by Lincoln, particularly at older attained ages.   And consequently, the higher the COI Rate, the greater the amount of the premiums required to maintain a positive policy value balance and avoid a lapse of the policy. The COI Rate is by far the most costly and important component of the Monthly Deduction charge.

29.     Value built up in the policyholders' interest-bearing account generates interest at a minimum guaranteed rate (or, potentially a higher non-guaranteed rate).   Absent other contributions, the interest generated is reduced by the amount of the COI charge and a charge for administrative expenses associated with the policy.  If the COI and administrative charge exceed the interest generated for the month (plus any amounts paid into the policy account), the policy value (and interest generating "principal") is reduced by the Monthly Deduction.

30.     As Jefferson-Pilot explained in some of its marketing materials, "Universal Life Insurance is a kind of flexible policy that lets you vary your premium payments.  You can also

adjust the face amount of your coverage. . . .   The premiums you pay (less expense charges) go into a policy account that earns Interest.  Charges are deducted from the account.  If your yearly premium payment plus the interest your account earns is less than the charges, your account value will become lower.  If it keeps dropping, eventually your coverage will end.  To prevent that, you may need to start making premium payments, or Increase your premium payments, or lower your death benefits.  Even if there is enough in your account to pay the premiums, continuing to pay premiums yourself means that you build up more cash value."

31.     The size of the COI charge is highly significant to Plaintiffs and all UL policyholders for at least two important reasons: (a) the COI charge is typically the highest expense that a policyholder pays; and (b) the COI charge is deducted from the policy account (i.e., the savings or investment component) of the policy, so the policyholder forfeits the COI charge entirely.

32.     Jefferson-Pilot's (now Lincoln's) insurance policies limit its ability to increase COI rates. All Policies of the named Plaintiffs contain the following contractual limitations (emphases added):

> The monthly cost of insurance rates are determined by us.  **Rates will be based on our expectation of future mortality, interest, expenses, and lapses.**  Any change in the monthly cost of insurance rates used will be on a **uniform basis** for Insureds of the same rate class.

33.     This provision restricts the circumstances under which Lincoln may raise the COI rate and does not permit Lincoln to increase COI rates, for example, to cover for improper dividends Lincoln Life paid to Lincoln National, or miscalculations concerning past mortality assumptions, or past interest rates, expenses or lapse rates.  Likewise, Lincoln is not permitted, pursuant to the policy terms to increase COI charges to earn future profits higher than the level projected at the time the Policies were priced.  Under the policies, COI rates may only be raised

based on expected *future* experience relating to the enumerated factors resulting from a deviation between actual and assumed experience using actuarially sound practices.

34. Nowhere does the language of the policies permit Lincoln to increase COI Rates and consequently increase the Monthly Deduction in order to recoup past losses or to recover for prior profits lower than the profitability assumed at pricing, including those associated with its guaranteed or non-guaranteed interest rates. Nor do the policies disclose any ability or intent to do so. As such, Lincoln may not increase its COI Rates and in turn, its Monthly Deduction to recoup past losses, to recover for prior profits lower than the profitability assumed at pricing. Furthermore, Lincoln may not increase the COI Rates when there is no reasonable expectation of a future adverse change in mortality, interest, expenses and/or lapses.

35. Alternatively, even if the Policies do not expressly bar Lincoln from increasing COI rates to cover past losses or poor portfolio management, the language is at least ambiguous to the point that it should be construed against the drafter (here, the successor-in-interest to the drafter, Lincoln) and consistent with the reasonable expectation of policyholders, like Plaintiff and the members of the Classes.

36. The Polices also state that "[u]pon request, we will provide, without charge, an illustration showing projected policy values based on guaranteed as well as current mortality and interest factors."

37. On information and belief, all polices impacted by the 2016 increase contain the same terms as above. The policies at issue are all form policies, and insureds are not permitted to negotiate different terms. They are all contracts of adhesion.

13

**B.**     **Lincoln's COI Increases**

38.     In August 2016, Lincoln announced that it would be increasing interest rates on certain Jefferson-Pilot policies.

39.     In September 2016, Lincoln sent increase notices to policyholders of several Jefferson-Pilot product lines, announcing an increase effective beginning in October 2016.  To justify the increase to policyholders, Lincoln simply pointed to "nearly a decade of persistently low interest rates, including recent historic lows, and volatile financial markets."

40.     Lincoln told its brokers that the COI increases are the result of

- "Lower investment income as a result of continued low interest rates";

- "Updated mortality assumptions, including instances of both higher and lower expected mortality rates versus prior expectations"; and

- "Updated expenses, including higher reinsurance rates."

**C.**     **The COI Increases Are Unlawful**

**1.   The COI Increases Were Not Based on the Enumerated Factors**

41.     The Jefferson-Pilot contracts governing the UL policies state that "[r]ates will be based on our expectation of future mortality, interest, expenses, and lapses."

42.     Lincoln has pointed to 3 factors that it purports justify the increase: lower investment income as a result of continued low interest rates, "updated" mortality assumptions, and "updated" reinsurance costs – but those estimates are not sufficient to and do not justify the large increases imposed of, in many cases, well over 50%.

43.     *First*, Lincoln's expectations of future investment returns could not reasonably be materially lower than what Lincoln originally expected – and any change in investment returns

would be far too small to justify a COI increase of this massive size, especially when combined with the dramatic *improvements* in mortality that have occurred since the policies were priced.

44.     Lincoln's COI increases result in COI rates higher than those set forth in illustrations sent to Plaintiffs, from at least 2010 to 2014.  But under the terms of the policy, and under basic actuarial principles embodied in Actuarial Standards of Practice 24, Lincoln was required to illustrate future COI rates based on Lincoln's then-*current* assumptions as to mortality, interest, and any other experience factors that underlie the COI rates.  Because Lincoln's investment returns have not materially changed for the worse since the times when those illustrations were sent in 2010-2016, Lincoln cannot now claim that any change in investment return justifies the increase.  For example, Lincoln National's Q2 2016 reporting supplement shows a 5.22% earned rate on reserves, a mere tenth of a percent lower than the prior year.  Indeed, for the nine months ending September 30, 2016, Lincoln National reported that fee income from COI charges was up 9% over the first three quarters of 2015, while the "Account Values" and the "In-Force Face Amount" of universal life policies increased by only 2% as compared with the first three quarters of 2015.  Similarly, on Lincoln's financial statements, Lincoln indicated that its "investment income" has *grown* in recent years, reporting: $4.551 billion (2012), $4.561 billion (2013), $4.648 billion (2014), $4.611 billion (2015), $4.631 billion.

45.     Further, as discussed in more detail below, Lincoln admits that it is relying on its "past" and "continued" alleged lower investment returns to justify the increase, which is impermissible because an increase can only be justified by changed *future* expectations. Likewise, as discussed below, Lincoln's attempt to justify the increase based on "lower investment income as a result of continued low interest rates" is a naked attempt to circumvent the guaranteed minimum interest rate that the policies promise to **credit** to policyholders.

15

46.     *Second*, reinsurance costs cannot provide material support for the increase, and reinsurance costs are not an enumerated permissible factor for an increase.  Reinsurance is a cost that the insurer voluntarily undertakes with an undisclosed third party; it is not a cost of directly administering the policy.  Further, Lincoln National's recent earnings releases do not mention losses due to increased reinsurance costs at all – in fact, its Q4 2014 results show a $53 million profit on recapturing policies from out of reinsurance contracts.  Whatever changes there have been in Lincoln's future reinsurance costs cannot provide material support for the increase.

47.     To the extent Lincoln claims that the third-party reinsurance companies demanded premium increases, or that Lincoln recaptured certain liabilities associated with the policies to avoid increased reinsurance premiums, any such increases were a direct result of Lincoln's own past failure to adhere to the underwriting standards used to price the reinsurance treaties rather than any future change in expected experience.

48.     *Third*, Lincoln claims that changing mortality expectations has contributed to some COI increases.   But the opposite is true: Lincoln has filed interrogatories with the NAIC in each year from 2010 to 2014 stating that it expects mortality experience to improve.  Additionally, Lincoln's 2015 Annual Statement stated that "mortality experience is also predicted to improve in the future."  And in its Quarterly Report on Form 10-Q filed with the SEC for the third quarter of 2016, Lincoln National informed investors that "[m]ortality was in line with [Lincoln National's] expectations during the third quarter of 2016."

49.     Nationwide, mortality (normally the most important element in COI rates) has continuously *improved* since the policies were issued.  Beginning at least as early as 1980, the National Association of Insurance Commissioners (NAIC) has issued a series of Commissioners Standard Ordinary (CSO) mortality tables.  These are industry standard mortality tables that were

commonly used by insurers at the time the policies were priced to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies.  In 2001, at the request of the NAIC, the Society of Actuaries (SOA) and the American Academy of Actuaries (Academy) produced a proposal for a new CSO Mortality Table.  The accompanying report from June 2001 explained that (a) the 1980 CSO Mortality Table was still the industry-standard table and (b) mortality rates had improved significantly each year since the 1980 table issued.  An investigative report on the update of the CSO tables by the society was published in March 2015 and showed further significant reductions in insurance company reserves compared to CSO 2001 due to continuous mortality improvements since 2001.

50.     Moreover, Lincoln sent the owners several illustrations on the policies using the pre-increase COI rates.  The policies state that the illustrations will depict future COI rates based on "current mortality and interest factors."  The illustrated COI rates in those illustrations were significantly lower than what they are after the COI increase, but mortality experience has not changed for the worse in the years since those illustrations were provided.  Since the illustrations were required to reflect "current mortality" when issued, and they illustrated cheaper future COI rates using those mortality assumptions, Lincoln cannot use its now-current mortality experience to justify a massive increase in COI rates.  Alternatively, if the illustrations did not reflect Lincoln's then-current mortality assumptions when provided, then all these illustrations breached the contractual provision that the illustrations must be based on "current mortality and interest factors."

51.     Finally, changing interest rates, mortality, and reinsurance costs could not possibly justify the large and unusually sloped increase imposed on the policies at issue.  Specifically, no changes in these factors could warrant imposing an increase that would result in

Plaintiffs paying higher COI rates when the insured is younger than when she is older, which is the case for the Martindale policies.  This contradicts reasonable actuarial practice; for example, the Society of Actuaries report of the Individual Life Insurance Valuation Mortality Task Force lists three basic goals for the mortality table, and the COI rates for the Martindale Policies run contrary to the third: "Mortality for any given attained age should increase with duration since issue."  Some other factor must have been included in the increase to generate that strange and illogical shape, and the contract language does not permit such other factors to be used as the basis for a COI increase.

### 2.     The COI Increases Operate to Recoup Past Losses

52.     The contract requires that "[r]ates will be based on our expectation of *future* mortality, interest, expenses, and lapses."  This forbids COI increases that are based on a carrier's desire to increase profits beyond the level assumed at pricing or to make up for past losses.  Actuarial principles similarly prohibit the carrier from implementing a COI increase that would result in the carrier making more profit on the policies than it originally expected using its original expectations.  Further, in its fillings with the NAIC, Lincoln explained that "[c]ost factors that can vary are periodically reviewed and may be adjusted based on changes in prospective assumptions.  The adjustments are made in such a way that past losses (i.e., experience less favorable to the company than expected) are not recouped."

53.     Contrary to these basic principles, Lincoln admitted that it was using the increase to recover *past* losses when, in its letter to policyholders, it pointed to "**nearly a decade of persistently low interest rates**, including **recent historic lows**, and volatile financial markets" to justify the increase.  Lincoln doubled down on this admission when it told brokers that the increases were allegedly due to "lower investment income as a result of **continued** low interest rates."  (Emphasis added.)  Lincoln's President and CEO Dennis Glass admitted to a reporter in

or around September 2016 – during the same time frame the increases were announced – that Lincoln sees in-force repricing (i.e., COI increases) as an opportunity to blunt the impact of the prevailing low interest rate environment.

54.     Further, the facts stated above (including dramatic improvements in mortality), which indicate that a COI increase of this magnitude could not be supported by changes in Lincoln's *future* cost expectations, confirm that Lincoln is increasing its profit targets on an old, closed block, and is attempting to recoup past losses.  In addition, the illustrations sent to Plaintiffs were required to be based on then-current mortality assumptions.  Because mortality assumptions have not materially changed for the worse since then, the new increase massively increases Lincoln's profits on the policies.

55.     In revealing that the increase is allegedly due in part to "lower investment income as a result of continued **low interest rates**" (emphasis added), Lincoln has made plain that it is trying to avoid its contractual obligation to meet the high interest crediting rates it promised under the Policies, and to recoup past losses or past profits lower than the level of profitability assumed at pricing – thereby increasing future profits to levels higher than those projected at pricing.  The policies guarantee that Lincoln will credit to policy accounts a minimum interest rate, often called the credited rate, of no less than 4% interest.  While the interest rate can be higher, it cannot be lower than that – and the interest rate Lincoln credits is now at the floor of 4%.

56.     In April 2012, the Center for Insurance Policy & Research (CIPR), a branch of the National Association of Insurance Commissioners, published a report warning of the effects on insurers of a prolonged period of low level interest rates, stating in relevant part:

> Life insurance companies face considerable interest rate risk given their investments in fixed-income securities and their unique liabilities.   For life

insurance companies, their assets and liabilities are heavily exposed to interest rate movements.  Interest rate risk can materialize in various ways, impacting life insurers' earnings, capital and reserves, liquidity and competitiveness.  Moreover, the impact of a low interest rate environment depends on the level and type of guarantees offered.  Much of the business currently on life insurers' books could be vulnerable to a sustained low interest rate environment . . . .

Life insurers typically derive their profits from the spread between their portfolio earnings and what they credit as interest on insurance policies.  During times of persistent low interest rates, life insurers' income from investments might be insufficient to meet contractually guaranteed obligations to policyholders which cannot be lowered.

***

In a low interest rate environment, it is challenging to find relatively low-risk, high-yield, long-duration assets to match annuities that guarantee a minimum annual return (e.g., 4%).  For many policies, low interest rates mean that some mismatch with assets is likely.  For example, older fixed income insurance products that guarantee rates of around 6%—closely matching or conceivably even surpassing current investment portfolio yields—are likely to put a strain on life insurers as a result of spread compression or possibly negative interest margins.

CIPR Report, at 2-3.

57.     Lincoln explained that the increase was based on prior low investment returns, which caused Lincoln to sustain past losses or past profit levels lower than the priced-for levels during those prior years.  Lincoln now seeks to offset or subsidize its credited interest guarantees and recoup its past financial problems through the COI rate increases and increased Monthly Deductions.  What Lincoln is actually doing is attempting to avoid its obligation to credit the guaranteed interest rates under the Policies, to recoup past losses or past reduced profits and to shed the Policies by making the premiums to maintain them cost-prohibitive for the Policyholders – thereby frustrating the Policyholders' ability to receive their contractual benefits under the Policies.

58.     Moreover, when Jefferson-Pilot priced and sold the Policies, it established a Monthly Deduction schedule that was designed to generate high profits in early durations

followed by potential losses in later durations.  Now, Lincoln, the successor to Jefferson-Pilot, wants to reverse that decision, and seeks to impose unfair and excessive COI rate increases to recoup the reduced profits and losses resulting from the rate schedule the company it acquired affirmatively enacted.

59.     However, non-guaranteed elements such as the COI rate and Monthly Deduction are required to reflect expectations of future, not past experience.  Accordingly, Lincoln is precluded from re-determining those elements to recoup past losses or past constrained profits. To do so would violate the actuarial standards of practice and code of professional ethics.

60.     The Class Members hit hardest by Lincoln's unconscionable business practice are elderly policyholders, many of whom have dutifully paid premiums for over a decade or more based on the expectation that in their twilight years the Policies would provide protection for their families.  Due to age-related underwriting considerations, life insurance protection for these elderly policyholders and Plaintiffs is now either unavailable or prohibitively expensive; thus Defendants' actions have stripped Plaintiffs and the Class of future life insurance protection.

61.     Lincoln's attempt to deprive Plaintiffs and the Class Members of the primary benefit of their Policies – paid for through years of contributions to their policy values – violates Lincoln's express and implied obligations under the Policies, amounts to "unlawful" and "unfair" conduct, and (in the case of Policyholders aged sixty-five or older) statutory elder abuse.

### 3.     The COI Increases Were Not Uniform

62.     The policies listed among the class representatives show widely varying increases, including within the same rate class.

63.     In addition, an illustration provided by Lincoln Life of the COI increase on the Martindale Policies shows increases of roughly 95% in the first year and 50% in the remaining two years.  The increase also results in the COI rates being higher when the insured is 98 years

21

old than when she is 99 years old.  This is illogical and contrary to how the policy was originally priced, and was not replicated across the class.  Other named plaintiffs, and other victimized policyholders of the same rating class, did not receive an increase with this strange and illogical slope, which is contrary to basic actuarial principles that "mortality for any given attained age should increase with duration since issue."

64.     These non-uniform increases violate the contractual provision stating that "Any change in the monthly cost of insurance rates used will be on a **uniform** basis for Insureds of the same rating class."  (Emphasis added.)

### 4.     Lincoln Refuses to Provide Illustrations of Policies in Their Grace Periods upon Request

65.     The relevant policies state: "Upon request, we will provide, without charge, an illustration showing projected policy values based on guaranteed as well as current mortality and interest factors.  The first illustration in any policy year will be furnished free of charge.  Any illustration after the first in any policy year may be obtained for a fee of $10.00."

66.     The US Life Plaintiffs requested an illustration for the Martindale policy in January 2017, but Lincoln refused to provide an illustration on the grounds that the policy is in its grace period, stating a company-wide policy: "While a policy is in a grace period, we are unable to provide an inforce illustration."

67.     By refusing to provide an illustration, Lincoln breached the contract.  Lincoln's companywide refusal to provide illustrations to any policyholder whose policy is in its grace period is in contravention of the same contractual language.  During grace period, a policy is considered to be in force.

## 2016 COI INCREASE CLASS ACTION ALLEGATIONS
### ("2016 COI Increase Class" and State Law Sub-Classes)

68.     This action is brought by Plaintiffs individually and on behalf of the following

class – referred to herein as the "2016 COI Increase Class" – which consists of:

> All owners of universal life insurance policies issued by Jefferson-Pilot
> Corporation (now The Lincoln National Life Insurance Company) that were
> issued a notice of the cost of insurance rate increase announced in August to
> October 2016, including owners of JP Legend 300, and JP Litewriter Legend 100,
> 200 and 400 series (excluding defendant Lincoln, its officers and directors,
> members of their immediate families, and the heirs, successors or assigns of any
> of the foregoing).

69.     This action is also brought on behalf of individual plaintiffs and associated sub-

classes of the 2016 COI Increase Class, as set forth below in the claims for relief (the "State Law

Sub-Classes").   The 2016 COI Increase Class and State Law Sub-Classes each consists of

thousands of consumers of life insurance and is thus so numerous that joinder of all members is

impracticable.   The identities and addresses of class members can be readily ascertained from

business records maintained by Lincoln.

70.     The claims asserted by Plaintiffs are typical of the claims asserted by the 2016

COI Increase Class and the State Law Sub-Classes.

71.     Plaintiffs will fairly and adequately protect the interests of the 2016 COI Increase

Class, and do not have any interests antagonistic to those of the other members of this class.

72.     Plaintiffs have retained attorneys who are knowledgeable and experienced in life

insurance matters, COI increase matters, as well as class and complex litigation.

73.     Plaintiffs request that the Court afford class members with notice and the right to

opt-out of any class certified in this action.

74.     This action is appropriate as a class action pursuant to Rule 23(b)(3), Rule

23(b)(2) and Rule 23(b)(1), of the Federal Rules of Civil Procedure because common questions

of law and fact affecting the class predominate over those questions affecting only individual members. Those common questions include:

      (a)    the construction and interpretation of the form insurance policies at issue in this litigation;

      (b)    whether Lincoln's actions to increase the cost of insurance charges on certain UL policies violated the terms of those form policies;

      (c)    whether Plaintiffs and Class members are entitled to receive damages as a result of the unlawful conduct by defendant alleged herein and the methodology for calculating those damages; and whether

      (d)    whether Lincoln's illustrations sent to policyholders were materially misleading;

      (e)    whether Lincoln's decision to increase COI rates applies generally to the class, so that injunctive or declaratory relief is appropriate respecting the class as a whole;

      (f)    Whether Lincoln has engaged in the financial abuse of elders within the meaning of California's Elder Abuse Statute;

      (g)    whether inconsistent or varying adjudications with respect to individual class members concerning the propriety of the COI increase would establish inconsistent standards of conduct; and

      (h)    whether adjudications concerning the COI increase would, as a practical matter, be dispositive of interests of other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

      75.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a)     the complexity of issues involved in this action and the expense of litigating the claims, few, if any, class members could afford to seek legal redress individually for the wrongs that defendant committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

(b)     when defendant's liability has been adjudicated, claims of all class members can be determined by the Court;

(c)     this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d)     without a class action, many class members would continue to suffer injury, and defendant's violations of law will continue without redress while defendant continues to reap and retain the substantial proceeds of its wrongful conduct; and

(e)     this action does not present any undue difficulties that would impede its management by the Court as a class action.

## ILLUSTRATION GRACE CLASS ACTION ALLEGATIONS
### ("Illustration Grace Class")

76.     Plaintiffs re-allege and incorporate all allegations of this complaint as if fully set forth herein.

77.     This action is brought by Plaintiffs individually and on behalf of the following class – referred to herein as the "Illustration Grace Class" – which consists of:

> All policyholders of life insurance policies issued by The Lincoln National Life Insurance Company or its predecessors, successors, or subsidiaries (excluding defendant Lincoln, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing), whose policies include the following language: "Upon request, we will provide . . . an illustration …."

78.     This class consists of thousands of consumers of life insurance and is thus so numerous that joinder of all members is impracticable.  The identities and addresses of class members can be readily ascertained from business records maintained by Lincoln.

79.     The claims asserted by Plaintiffs are typical of the claims asserted by the Illustration Grace Class.

80.     Plaintiffs will fairly and adequately protect the interests of the Illustration Grace Class and do not have any interests antagonistic to those of the other members of this class.

81.     Plaintiffs have retained attorneys who are knowledgeable and experienced in life insurance matters as well as class and complex litigation.

82.     This action is appropriate as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because defendant Lincoln has refused to provide illustrations for policies in grace period to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract against Lincoln**
**(on behalf of Plaintiffs and the 2016 COI Increase Class)**

83.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

84.     The subject policies are binding and enforceable contracts.

85.     The 2016 COI rate increases have materially breached the policies, and the implied covenant of good faith and fair dealing.

86.     Plaintiffs have performed all of their obligations under the policies, except to the extent that their obligations have been excused by Lincoln's conduct as set forth herein.

87.     As a direct and proximate cause of Lincoln's material breaches of the policies, plaintiffs and the classes have been – and will continue to be – damaged as alleged herein in an amount to be proven at trial.

**SECOND CLAIM FOR RELIEF**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(on behalf of Plaintiffs and the 2016 COI Increase Class)**

88.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

89.     Lincoln is the successor-in-interest to Jefferson-Pilot Life Insurance Company and is a party to Plaintiffs' Policy and the Policies of the members of the Class.

90.     The Policies are valid, enforceable contracts between Lincoln, as successor-in-interest to Jefferson-Pilot and Plaintiffs or the members of the Class.

91.     Contractual covenants of good faith and fair dealing through which Lincoln owes Plaintiffs and the members of the Classes a duty to act in a manner that did not frustrate their reasonable expectations under the Policies are implied in the Policies.

92.     Defendants contractually breached the covenant of good faith and fair dealing because, to the extent Lincoln had the discretion to increase the COI rate and Monthly Deduction, that discretion was sufficiently constrained under the terms of Policies to support an implied obligation of good faith and fair dealing with respect to the cost of insurance charges and associated extraordinarily higher premiums.  Defendants further breached the covenant of good faith and fair dealing by imposing unfair and burdensome premium increases that have caused policy holders to pay excessive COI rates or be forced into "shock lapses."

93.    Defendants' contractual breach of the covenant of good faith and fair dealing has proximately caused damages to Plaintiffs and the members of the Class in an amount to be determined at the time of trial.

94.    In addition, unless Defendants are preliminarily and permanently enjoined from continuing to deduct the unlawfully increased Monthly Deduction charges, Plaintiffs and the members of the Classes will suffer severe and irreparable injuries for which they have no adequate remedy at law.

**THIRD CLAIM FOR RELIEF**
**Injunctive Relief as to Illustrations in Grace Period**
**(on behalf of Plaintiffs and the Illustration Grace Class)**

95.    Plaintiffs' contracts state: "Upon request, we will provide, without charge, an illustration showing projected policy values based on guaranteed as well as current mortality and interest factors."

96.    Lincoln has refused to provide illustrations for policies in their grace period, stating a company-wide policy that: "While a policy is in a grace period, we are unable to provide an inforce illustration."

97.    Lincoln's refusal to provide illustrations while the policy and the underlying contract remain valid represents a clear breach of contract.

98.    Plaintiffs therefore seek, on behalf of all Lincoln life insurance policyholders whose contracts contain such language, injunctive relief prohibiting Lincoln from denying illustrations to policyholders during their policies' grace periods.

28

**FOURTH CLAIM FOR RELIEF**
**Injunctive Relief as to COI Increases**
**(on behalf of Plaintiffs and the 2016 COI Increase Class)**

99.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

100.    Defendants engaged in the following practices, among others:

a.      Imposing the COI increase even though Defendants' expected future mortality exposure has improved and is better than the mortality upon which the original COI rate schedule is based – in order to increase premiums, recoup past losses, or force policyholders to surrender their policies, all of which is designed to enhance Defendants' profit margin contrary to, and precluded by, the express terms of the policies.

b.      After the sale of the policies, sending annual reports, policy servicing statements, illustrations and other documents and correspondence to Plaintiff and the members of the Classes without disclosing that there would be sudden, dramatic, and cost-prohibitive increases in the COI amount in October 2016.

c.      Failing to provide any meaningful advance warning that they intended to massively and suddenly increase the COI amount commencing in September 2016 and/or effective October 2016.

d.      Ultimately providing a false and misleading explanation to Plaintiffs and the members of the Classes of the grounds for the COI charge increase.

101.    On behalf of the general public and the Class, Plaintiffs respectfully request that the Court issue an injunction against Defendants preliminarily and permanently enjoining them (i) from continuing to engage in the unlawful and unfair conduct and preventing Defendants from collecting the unlawfully and unfairly increased COI amounts in violation of the Policies and (ii) ordering any policy to be reinstated that was surrendered or terminated as a result of the COI increase.

102.    On behalf of the general public and the Class, Plaintiffs further respectfully request that this Court order restitution to be paid by Defendants to the Class for COI charges, amount of the increased premiums paid, and other amounts wrongfully required, obtained and

29

collected as the result of the COI increase in violation of the Policies.

103.    Plaintiffs respectfully requests an award of attorney fees as the prevailing party in his request for injunctive relief and restitutionary relief against Defendants on behalf of himself and the members of the Class.

## FIFTH CLAIM FOR RELIEF
### Declaratory Relief
### (on behalf of Plaintiffs and the 2016 COI Increase Class)

104.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.  Plaintiffs are asserting this claim for Declaratory Relief in this Amended Complaint solely for appellate preservation purposes, recognizing that the Claim was dismissed with prejudice in the Order entered September 11, 2017, and therefore further recognizing that Defendants have no obligation to serve an Answer to this claim.

105.    An actual controversy has arisen and now exists between Plaintiffs and the members of the Class, on the one hand, and Defendants, on the other hand, concerning the respective rights and duties of the parties under the Policies.

106.    Defendants contend that they lawfully and appropriately increased the COI amount, have appropriately collected (and are still collecting) COI charges based on the elevated monthly deductions, and that they are permitted to continue to make and collect the monthly deduction in the future for the duration of the Policies.  On the other hand, Plaintiffs and the members of the Class maintain that Defendants have inappropriately and unlawfully, in material breach of the express and implied terms of the Policies, implemented and collected inflated the COI amount.

107.    Plaintiffs seek a declaration as to the parties' respective rights under the policies and requests the Court to declare that the COI increase is unlawful and in material breach of the

policies so that future controversies under the policies may be avoided.

## SIXTH CLAIM FOR RELIEF
### Violations of the North Carolina Deceptive and Unfair Trade Practices Act,
### N.C. Gen. Stat. § 75-1, *et seq.*
### (on behalf of Plaintiffs and the 2016 COI Increase Class)

108.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.  This claim is brought on behalf of all Plaintiffs and the 2016 COI Increase Class.  The Rauch Plaintiffs are citizens and residents of North Carolina, and the other Plaintiffs are citizens and residents of other states throughout the country.  This claim is brought on behalf of all Plaintiffs and the 2016 COI Increase Class.

109.    The North Carolina Deceptive and Unfair Trade Practices Act, N.C. Gen. Stat. § 75-1.1, makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."

110.    Lincoln engaged in unfair and deceptive acts by surreptitiously raising the COI rate for the Policies and representing that these rate increases were in fact justified, when in reality Lincoln knew that its rate increase was not justified by future mortality rates (or any other proper justification for rate increases).  Lincoln's conduct frustrated the performance of the contract, and deceptively misled policyholders about the true reasons for the increase, in order to hide the breach.  This conduct offended established public policy in North Carolina, is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers, and amounts to an inequitable assertion of Lincoln's power and position over these form contracts.

111.    Lincoln's conduct was in commerce and affected commerce.  Lincoln's conduct had a substantial in-state effect on North Carolina trade and commerce.  In part because Jefferson-Pilot, prior to its acquisition by Lincoln in 2006, was headquartered and conducted a significant portion of its business in North Carolina, billions of dollars of affected policies were

sold to North Carolina residents as well as residents of other states from Jefferson-Pilot's headquarters in North Carolina.  Lincoln engaged in a single course of conduct impacting both North Carolina residents and residents nationwide.

112.   As a direct and proximate result of these unfair and deceptive commercial practices, the members of the Class have been damaged by having to pay higher COI rates and thereby also depleting cash account values, and by facing burdensome premium increases that has caused "shock lapses," and are entitled to recover actual and treble damages as well as attorneys' fees and costs and all other relief allowed under N.C. Gen. Stat. §§ 75-16 and 75-16.1.

**SEVENTH CLAIM FOR RELIEF**
**Violations of 28 Tex. Admin. Code §§ 21.2206 to 21.2212, Tex. Ins. Code art. 21.21**
**(on behalf of US Life and the Texas Sub-Class)**

113.   Plaintiffs re-allege and incorporate all allegations of this complaint as if fully set forth herein.  This claim is brought on behalf of Plaintiff US Life and the Texas Sub-Class.  The Texas Sub-Class consists of all members of the 2016 COI Increase Class, where the policy was issued for delivery in Texas.

114.   Defendants represented that their illustrations were based on their current expected future expenses and that COI rates would not increase above illustrated levels unless there was a change in their current expected future expenses from those that underlied the illustrations.

115.   If Lincoln's story is to be believed, the illustrations provided to US Life in 2010 showed improperly favorable non-guaranteed elements and illustrated non-guaranteed elements in a misleading manner.  For example the illustration provided in 2010 projected a COI charge of 1.4% per month for the period 3/19/2018 – 3/18/2019.  Based on this illustration, US Life continued to pay premiums into the policies, with total premiums paid into

the policy of $7,895,875.81 as of October 1, 2016.  After the COI increase US Life ordered a new illustration, which projects a COI charge of 2.0% per month that will be applied for the period 3/19/2018 – 3/18/2019.  On an annualized basis, this is an increase from 15.7% COI charge to a 21.9% COI charge – a rate hike of nearly 40%.  Subchapter N of the Texas Department of Insurance Trade Practices regulations Rule § 21.2204 requires that Insurers develop a "Disciplined current scale" to act as a "limit on illustrations."  This scale must be "**reasonably** based on actual **recent** historical experience."  Rule §21.2204(5) (emphases added).  Insurers may not use an illustration that "depicts performance more favorable to the policy owner."  Rule § 21.2206(2)(E) – Prohibited conduct.  If Lincoln's justification of the COI increase is to be believed, the illustration provided on or around August 3, 2010, that projected a future COI charge of 1.4% per month, rather than 2.0% per month, depicted performance more favorable to the policy holder than would have been possible using a scale that was reasonably based on their recent experience.  The reason for this is simple: Lincoln's expectations could not have changed between 2010 and 2016 in a large enough manner to justify such a massive COI increase, and Lincoln has never said anything publicly to suggest otherwise (despite its many pronouncements on the grounds for the increase).  These misleading illustrations caused US Life to pay more in premiums than it otherwise would have.

116.   Lincoln gives three reasons for the increase: none has changed since 2010 in a manner that could justify this massive increase.

117.   First, Lincoln claims the rate hike is justified by "[u]pdated mortality assumptions, including instances of both higher and lower expected mortality rates versus prior expectations."  But Lincoln's mortality expectations and experience have *improved* between 2010 and 2016.  As alleged above, Lincoln has filed interrogatories with the NAIC in each year

from 2010 to 2014 stating that it expects mortality experience to improve. Additionally, Lincoln's 2015 Annual Statement stated that "mortality experience is also predicted to improve in the future." And in its Quarterly Report on Form 10-Q filed with the SEC for the third quarter of 2016, Lincoln National informed investors that "[m]ortality was in line with [Lincoln National's] expectations" during the third quarter of 2016. Lincoln's 2016 Annual Report states that "[i]n 2016, we experienced modestly favorable mortality." Improving mortality – which has occurred continuously for Lincoln over the relevant period – increases the period over which premiums are received and concomitantly reduces payout of death benefits. There thus cannot have been a change in mortality since 2010 that would justify *increasing* COI charges; rather, the mortality experience and expectations should have led to a *decrease* in COI charges. This trend of improving mortality has also been observed industry-wide. The Society of actuaries has published three valuation basic tables (VBT) since 2000: the 2001 Valuation Basic Mortality Table; the 2008 Valuation Basic Table; and the 2015 Valuation Basic Table. The tables show consistent improvement in mortality expectations in the industry, from one table to the next, and confirm the unreasonableness of changes of 40% suffered by plaintiff. In 2015, the Society of Actuaries published a report indicating that industry experience studies have shown significant improvement in the mortality rates experienced by the industry from that underlying the 2001 tables. The Society of Actuaries noted that in developing the tables, the 2015 tables relied on data from 2002-2009, and projected mortality improvement through 2015 based on industry data. In updated tables for 2017, the Society of Actuaries explained that it would continue to project mortality improvement through 2017 based on more recent industry data. In sum, given that mortality is the most important component of COI charges, and that mortality has improved in

recent years, it is not possible that Lincoln's COI rates are appropriate now *and* that Lincoln accurately forecasted much lower future COI rates in 2010.

118.   Second, Lincoln has pointed to low interest rates as justifying its decision to raise COI rates, claiming that lower rates require higher COI charges.   But if interest rates and COI charges are inversely related, as Lincoln claims, then *increasing* interest rates cannot justify an *increase* in the COI charges.   And yet, interest rates have *increased* since 2010; the federal funds rate remained at 0.25% from December 2008 to December 2015 before increasing.   And Lincoln's press release in 2016 announcing the increase pointed to "nearly a decade of persistently low interest rates," indicating that whatever experience allegedly led to the increase had already been in place for several years prior to 2010.   Thus, as with mortality, there is no basis for Lincoln to raise COI rates based on alleged changes from 2010.   Further, Lincoln points to investment income as a reason for the increase, but Lincoln's investment income is not an enumerated factor under the policy (only "interest" is), and is not a *cost* of insurance.

119.   Third, reinsurance costs are not costs of insurance and reinsurance is not an enumerated factor, and there has been no change in reinsurance costs from 2010 that would justify an increase of this size.   As alleged above, Lincoln National's recent earnings releases do not mention losses due to increased reinsurance costs at all – in fact, its Q4 2014 results show a $53 million *profit* on recapturing policies from out of reinsurance contracts.   Further, the New York insurance department has recently announced final regulations explaining that reinsurance costs cannot be used to justify COI increases because they are not costs of insurance.   Whatever changes there have been in Lincoln's future reinsurance expectations cannot provide material support for the increase.

120.    Finally, Lincoln has never claimed that there has been a change in expectations *from 2010* that would justify a COI increase.  Rather, it has continually pointed to alleged changes in its expectations from when the policies issued – which, among all policies hit by the increase, issued between 1999 and 2007.

121.    Pursuant to Tex. Ins. Code art. 21.21 § 16(b), Plaintiffs and the Texas Sub-Class are entitled to (1) actual damages plus court costs and reasonable and necessary attorneys' fees, (2) treble damages for a knowing violation, (3) an injunction against the COI increase, and (4) any other relief that the court deems proper.

**EIGHTH CLAIM FOR RELIEF**
**Violations of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 *et seq*.**
**(on behalf of Bharwani and the New Jersey Sub-Class)**

122.    Plaintiffs re-allege and incorporate all allegations of this complaint as if fully set forth herein.  This claim is brought on behalf of Plaintiffs Bharwani, Milgrim and the New Jersey Sub-Class. The New Jersey Subclass consists of all members of the 2016 COI Increase Class, where the policy was issued for delivery in New Jersey.

123.    Defendants' conduct constitutes an extremely sophisticated method of deception.

124.    Defendants' actions as set forth above occurred in the conduct of trade or commerce.

125.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

126.    Defendants intentionally and knowingly misrepresented material facts regarding its intent and ability to increase COI Rates and knowingly deceived policyholders and regulatory agencies or bodies by expressly and impliedly representing that cost of insurance charges would not be raised to recoup past losses when, in fact, they were, and, additionally, by their scheme, as

36

alleged heretofore, to force or induce shock lapses by policyholders, including elderly Class Members.

127.    Defendants knew or should have known that their conduct violated N.J. CFA.

128.    Defendants owed Plaintiffs and the New Jersey Sub-Class a duty to disclose the truth at all times material.

129.    Defendants' conduct has proximately caused injuries to Plaintiff and the other New Jersey Sub-Class members.

130.    Defendants' conduct proximately caused injuries to Plaintiff and the other New Jersey Sub-Class members.

131.    Defendants' violations present a continuing risk to Plaintiff, the New Jersey Sub-Class Members and the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

132.    Pursuant to N.J. Stat. Ann. § 56:8-20, Plaintiff Bharwani previously served a copy of the initial complaint filed in this Action on the New Jersey Attorney General.

**NINTH CLAIM FOR RELIEF**
**Violations of General Business Law § 349**
**(on behalf of Zirinsky and the New York Sub-Class)**

133.    Plaintiffs re-allege and incorporate all allegations of this complaint as if fully set forth herein.  This claim is brought on behalf of Plaintiff Zirinsky and the New York Sub-Class. The New York Sub-Class consists of all members of the 2016 COI Increase Class, where the policy was issued for delivery in New York.

134.    New York General Business law § 349 prohibits the use of deceptive acts or practices in the conduct of any business, including insurance, in the state of New York.

135.    Defendants represented that their illustrations were based on their current expected future expenses and that COI rates would not increase above illustrated levels unless there was a change in their current expected future expenses from those that underlay the illustrations.

136.    If Lincoln's story is to be believed, Defendants have willfully violated Section 349 by, among other thing, willfully providing misleading illustrations to policyholders in order to lure them to continue paying premiums under false pretenses.  The illustrations provided to Zirinsky in at least 2014 and 2016 showed improperly favorable non-guaranteed elements and illustrated non-guaranteed elements in a misleading manner, if Lincoln's story is to be believed. There has been no change for the worse in mortality, or other experience factors, between the time of those illustrations and the time of the increase that would justify such a massive change in Lincoln's expected future costs.  If Lincoln's story is to be believed, it has hidden this increase for a long time through misleading illustrations designed to induce policyholders to continue paying premiums under false pretenses.  These misleading illustrations caused Zirinsky to pay more in premiums than he otherwise would have.

137.    The aforementioned conduct is likely to mislead and has misled reasonable consumers acting reasonably under the circumstances.  Defendants' conduct is consumer-oriented and of a recurring nature.  Lincoln, and its predecessor Jefferson-Pilot, marketed and sold Policies to the public at large in New York pursuant to form insurance policies that are contracts of adhesion.  Thousands of such Policies have been sold, thousands of illustrations have been sent to policyholders, and thousands of the policyholders have been affected.

138.    As a direct proximate cause of violation of Section 349, Plaintiff Zirinsky and New York Sub-Class members have been damaged as alleged herein in an amount to be proven at trial.

139.    Plaintiff Zirinsky, on behalf of himself and members of the New York Sub-Class, seeks monetary damages and injunctive relief, as well as costs and reasonable attorneys' fees.

**TENTH CLAIM FOR RELIEF**
**Violations of California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.***
**(on behalf of the Mindlin and Valentine Plaintiffs and the California Sub-Class)**

140.    Plaintiffs re-allege and incorporate all allegations of this complaint as if fully set forth herein. This claim is brought on behalf of Plaintiffs Mindlin and Valentine and the California Sub-Class. The California Sub-Class consists of all members of the 2016 COI Increase Class, where the policy was issued for delivery in California.

141.    Defendants committed acts of unfair competition in violation of California Business and Professional Code §§ 17200 *et seq.*

142.    Under the language of the policies, Defendants offered flexible premiums that would allow policyholders to fund only enough premiums to cover the monthly deductions, that the Company would not raise the COI Rate and consequent Monthly Deduction except based on certain anticipated future expense factors stated in the policies and as, acknowledge by its NAIC filings, would not raise the cost of insurance in order to recoup past losses.  Defendants made those representations in the Policies, on its website, its marketing materials and press releases, and its interrogatory responses in Lincoln's 2015 Annual Statement to the NAIC.

143.    Defendants have willfully violated Section 17200 *et seq.* by increasing COI Rates in order to recoup past losses despite assurances and representations that it would not do so, and

doing so as part of an unfair and deceptive scheme designed to force policy lapses by virtue of burdensome premium increases – a tactic known as "shock lapses."

144.    The aforementioned conduct is likely to mislead and has misled reasonable consumers acting reasonably under the circumstances.  For example, reasonable consumers expect that when they purchase flexible-premium universal life insurance, they need only pay the minimum premiums required to cover the COI charges and standard expense charges.  No reasonable consumer would expect that Defendants would punish consumers for doing exactly that, force them to increase their policy values upon threat of massive COI increases, and thereby effectively convert their flexible-premium policies into fixed-premium policies, or otherwise force them to let their policies lapse in the fact of such premium adjustments.

145.    Defendants' conduct is consumer-oriented and of a recurring nature.  Lincoln, and its predecessor Jefferson-Pilot, marketed and sold Policies to the public at large in California pursuant to form insurance policies that are contracts of adhesion.  Thousands of such Policies have been sold and thousands of the policyholders have been affected.

146.    As a direct proximate cause of violation of Section 17200 *et seq.*, the Mindlin and Valentine Plaintiffs and members of the California Sub-Class Members have been damaged as alleged herein in an amount to be proven at trial.

147.    The Mindlin and Valentine Plaintiffs, on behalf of themselves and members of the California Sub-Class, seek monetary damages and injunctive relief, as well as costs and reasonable attorneys' fees.

### ELEVENTH CLAIM FOR RELIEF
**Violations of California Elder Abuse Statute, Cal. Welf. & Inst. Code §§ 15610 *et seq.***
**(on behalf of the Mindlin and Valentine Plaintiffs and the California Sub-Class)**

148.    Plaintiffs re-allege and incorporate all allegations of this complaint as if fully set

forth herein.  This claim is brought on behalf of the Mindlin and Valentine Plaintiffs and the California Sub-Class.  The California Sub-Class consists of all members of the 2016 COI Increase Class, who were age 65 or older and were residents of California when the COI Increase impacted their policies.

149.    This cause of action is brought under California's Welfare and Institutions Code section 15610, *et seq.*

150.    Each member of California Sub-Class was 65 years or older at all times relevant to this claim.

151.    By imposing the COI Increase, Defendants took, depleted, appropriated and/or retained the Mindlin and Valentine Plaintiffs' and the California Sub-Class members' personal property in bad faith for a wrongful use and/or with the intent to defraud, which constitutes financial abuse as defined in California Welfare & Institutions Code section 15610.30.

152.    The insured Mindlin Plaintiff, Allen Mindlin, conveyed real estate to the Mindlin Trust, which is used to generate revenue, and that revenue in turn is used to pay premiums on the policy. The COI Increase made the voluntary transfer of Mr. Mindlin's chosen gift assets in his estate plan much more expensive and of lesser value, and so his right to dispose of his property has been damaged.  The challenged COI Increase increased the amount Lincoln withdrew from the Policy's accumulation account, which was funded by the assets and proceeds of the assets contributed by the insured, Plaintiff Allen Mindlin.

153.    Defendants are guilty of oppression, fraud, and malice in the commission of the above-described acts of abuse. At a minimum, Defendants knew or should have known that their conduct was likely to be harmful to elders.

154.    Under California Civil Code section 3294 Defendants are liable to Plaintiffs

41

Mindlin and Valentine and the California Sub-Class members for punitive damages.

155.     Under California Welfare & Institutions Code section 15657.5 Defendants are liable to Plaintiffs Mindlin and Valentine and the California Sub-Class members aged 65 years or older for reasonable attorney fees and costs.

### TWELFTH CLAIM FOR RELIEF
### Tortious Breach of the Duty of Good Faith and Fair Dealing
### (on behalf of the Mindlin and Valentine Plaintiffs and the California Sub-Class)

156.     Plaintiffs re-allege and incorporate all allegations of this complaint as if fully set forth herein.  This claim is brought on behalf of the Mindlin and Valentine Plaintiffs and the California Sub-Class.

157.     Life insurance policies, like those owned by the Mindlin and Valentine Plaintiffs and the California Sub-Class, protect them from the economic harm and risk presented by death. As is the case with most insurance contracts, Lincoln's financial interests and the Policyholders' financial interests are directly at odds: Lincoln benefits from increasing the COI charges to Policyholders and the Policyholders are harmed by such increases.

158.     For these reasons, Lincoln owes the Mindlin and Valentine Plaintiffs and the California Sub-Class a heightened duty of good faith and fair dealing.  Among other things, Lincoln must refrain from doing anything to injure JP policyholders' right to receive the benefits of the JP policies.  Lincoln is required to give at least as much consideration to the welfare of the JP policyholders as it gives to its own interests.  Furthermore, Lincoln has a duty to reasonably inform the Mindlin and Valentine Plaintiffs and the California Sub-Class of their rights and obligations under the JP policies.

159.     As alleged above, Lincoln has breached these duties in connection with the 2016 COI Increases, thereby frustrating the reasonable expectations of the Mindlin and Valentine

Plaintiffs and the California Sub-Class and tortiously depriving them of benefits under the JP policies.  In increasing the COI Rates, Lincoln did not give proper consideration to the welfare of the Mindlin and Valentine Plaintiffs and the California Sub-Class and served solely its own interests at their expense.  In addition, Lincoln has failed to truthfully, let alone reasonably, disclose or describe its course of conduct, or the basis and reasons for its course of conduct.

160.    Lincoln's alleged acts and omissions were and are unreasonable and without proper cause.  If left unabated, Lincoln's conduct will frustrate and deprive the Mindlin and Valentine Plaintiffs and the California Sub-Class of the reasonably expected benefits of the Policies.

161.    Lincoln has, in particular, improperly withheld benefits due to the Mindlin and Valentine Plaintiffs and the California Sub-Class under the Policies, because the unlawful COI increases have both (a) reduced the value of their account values, and (b) reduced the amount of interest credited on their policy accounts.

162.    Lincoln's tortious breach of the covenant of good faith and fair dealing has proximately caused damages to the Mindlin and Valentine Plaintiffs and the California Sub-Class in an amount to be determined at the time of trial.

163.    Lincoln's conduct was intentional, deliberate, and constitutes oppression, fraud, or malice. The Mindlin and Valentine Plaintiffs and the California Sub-Class are entitled to recover punitive and exemplary damages in an amount to be determined by the trier of fact. Plaintiffs also seek an order requiring Lincoln to disgorge all profits that it received in connection with the above referenced wrongful acts and omissions.

164.    In addition, unless Lincoln is permanently enjoined from continuing to deduct the unlawfully increased Monthly Deductions, the Mindlin and Valentine Plaintiffs and the

California Sub-Class will suffer severe and irreparable injuries for which they have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

1.      Declaring this action to be a class action properly maintained pursuant to Rule 23(b)(3) and Rule 23(b)(2) of the Federal Rules of Civil Procedure;

2.      Awarding Plaintiffs and the damages class compensatory damages, punitive damages, restitution, disgorgement, and any other relief permitted by law or equity;

3.      Awarding Plaintiffs and the damages class pre-judgment and post-judgment as well as costs, and all other relief set forth above;

4.      Awarding Plaintiffs and the injunctive class injunctive or declaratory relief, as well as attorneys' fees and costs; and

5.      Awarding Plaintiffs and the classes such other relief as this Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated: February 15, 2018

Jeffrey W. Golan
Robert A. Hoffman
Lisa M. Port
**Barrack, Rodos & Bacine**
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

44

**The Moskowitz Law Firm, PLLC**
Adam M. Moskowitz
Howard Bushman
2 Alhambra Plaza
Suite 601
Coral Gables, FL  33134
Telephone:  (305) 479-5508

**Kozyak Tropin & Throckmorton**
Gail A. McQuilkin
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, FL 33134
Telephone: (305) 372-1800

**Harke & Clasby LLP**
Lance A. Harke
Sarah Engel
9699 NE Second Avenue
Miami Shores, Florida 33138
Telephone: (305) 536-8220

**Merlin Law Group, P.A.**
William F. Merlin, Jr.
Michael N. Poli
Kesha A. Hodge
777 South Harbour Island Blvd., Suite 950
Tampa, Florida 33602
Telephone: (813) 229-1000

*Attorneys for Mukamal and Milgrim*
*Plaintiffs*

**Pietragallo Gordon Alfano Bosick &**
**Raspanti, LLP**
Gaetan J. Alfano
1818 Market Street, Suite 3402
Philadelphia, PA 19103
Telephone: (215) 998-1441

**Susman Godfrey L.L.P.**
Steven G. Sklaver
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100

and

Seth Ard
Jillian Hewitt
Lucas Issacharoff
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 336-8330

*Attorneys for US Life, Kanter, Mindlin,*
*Weinstein, and Valentine Plaintiffs*

**Berger & Montague, P.C.**
Patrick F. Madden
Shanon J. Carson
Glen Abramson
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-4656

**Goldman Scarlato & Penny, P.C.**
Brian D. Penny
Paul J. Scarlato
161 Washington Ave, Suite 1025
Conshohocken, PA 19428
Telephone: (484) 342-0700

*Attorneys for the Rauch Plaintiffs*

**Barrack, Rodos & Bacine**
Jeffrey W. Golan
Robert A. Hoffman
Lisa M. Port
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600

and

Stephen R. Basser
One America Plaza
600 W. Broadway, Suite 900
San Diego, CA 92101
Phone: (619) 230-0800

**Bonnett, Fairbourn, Friedman & Balint, P.C.**
Andrew Friedman
Francis J. Balint, Jr.
Kimberly Page
2325 E Camelback Rd #300
Phoenix, AZ 85016
Telephone: (602) 274-1100

**Sarraf Gentile LLP**
Joseph Gentile
Ronen Sarraf
14 Bond Street #212
Great Neck, NY 11021
Telephone: (516) 699-8890

**Emerson Scott, LLP**
John G. Emerson
840 Apollo Lane
Houston, TX 77058
Telephone: (281) 488-8854

*Attorneys for Bharwani and Zirinsky Plaintiffs*